**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| **JACK VENTON VENABLE, JR., and** | § | |
| **WILLIAM AGUIRRE, individually and on** | § | **Civil Action No. 6:16-cv-00241** |
| **behalf of all others similarly situated,** | § | |
| | § | |
| **Plaintiff,** | § | **Judge Robert R. Summerhays** |
| | § | |
| **v.** | § | **Magistrate Patrick J. Hanna** |
| | § | |
| **SCHLUMBERGER LIMITED** | § | |
| **(SCHLUMBERGER N.V.) fka SMITH** | § | |
| **INTERNATIONAL, INC.** | § | |
| | | |
| **Defendant.** | | |

**DEFENDANT SMITH INTERNATIONAL, INC.'S STATEMENT OF UNCONTESTED**
**MATERIAL FACTS WITH RESPECT TO ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendant Smith International, Inc. ("Smith") submits the

following Statement of Uncontested Material Fact as follows:

**A. Venable's Employment with Smith and Compensation.**

1.    Venable was employed with Smith from July 2012 until approximately September

25, 2015, when his employment was terminated as part of a reduction in force.[1]

2.    During this time, Venable's initial job title was SERVCO Field Specialist, and later

changed to DTR Field Specialist.[2]

3.    Despite this change in job title, Venable's job duties remained the same.[3]

4.    Other than a few "whipstock" jobs early in his employment, Venable performed the

Reamer job duties during his entire employment with Smith.[4]

---

[1]      Exhibit A, Venable Deposition, pp. 33, 49, 60.
[2]      Exhibit A, pp. 36-38.
[3]      *Id*.
[4]      *Id*.

5.      Venable was paid on a salary basis and received a guaranteed base salary that was not subject to reduction based on the quality or quantity of work.[5]

6.      Venable's annual salary was $56,700.00 (or $1,909.38 per week) from February 2013 through August 2013, $58,450.00 (or $1,124.04 per week) from August 2013 through August 2014, and $60,250.00 (or $1,164.42 per week) from August 2014 through September 2015 when Venable's employment with Smith ended.[6]

7.      Smith paid Venable his base salary every week regardless of the number of hours Venable worked.[7]

8.      Indeed, Venable received his base salary for weeks in which he did not work at all.[8]

9.      Venable received job bonuses for days he provided services to Smith's customers on their drilling rigs.[9]

10.      The amount of the job bonus differed based on various factors.[10]

11.       These job bonuses were non-discretionary, and the only requirement for Venable to earn a job bonus was to work on a drilling rig for a day.[11]

12.      In 2013, Venable's total annual compensation was approximately $300,060.64.[12]

13.      In 2014, Venable's total annual compensation was approximately $319,264.42.[13]

---

[5]      Exhibit A, pp. 37-39, 52-53.
[6]      Exhibit A, pp. 39; Exhibit B, B. Marroquin Decl., at its attached exhibit 6 (Venable's Employee Mini File). To note, Venable filed his Complaint on February 22, 2016. (Dkt. 1, Complaint.) As a result, the applicable statute of limitations for Venable's maximum period of recovery is from February 22, 2013, through the end of his employment in September 2015. 29 U.S.C. §255(a). Out of an abundance of caution, by using a three (3) year statute of limitations in connection with the Motion, Smith does not concede that it acted willfully under the FLSA such that the three (3) statute of limitations applies.
[7]      Exhibit A, p. 53.
[8]      Id.
[9]      Exhibit A, p. 54.
[10]     Exhibit A, pp. 54-55.
[11]     Id.
[12]     Exhibit A, p. 57.
[13]     Exhibit A, pp. 58-59.

14.     For the approximately nine (9) month period during which he was employed in 2015, Venable's total annual compensation was approximately $168,787.67.[14]

**B. Kemp's Employment with Smith and Compensation.**

15.     Kemp began his employment with Smith in 2005 and remained employed by Smith until May 4, 2019, when he voluntarily resigned.[15]

16.     During this time, Kemp served as a DTR Field Specialist, which is also referred to as a "reamer hand."[16]

17.     Other than a few "whipstock" jobs, Kemp performed the Reamer job duties during his entire employment with Smith.[17]

18.     Kemp was paid on a salary basis during his employment with Smith and received a guaranteed base salary that was not subject to reduction based on the quality or quantity of work.[18]

19.     Kemp's annual salary was $54,700.00 (or $1,051.92 per week).[19]

20.     Smith paid Kemp his base salary every week regardless of the number of hours Kemp worked.[20]

21.     Kemp received job bonuses for days he provided services to Smith's customers on their drilling rigs.[21]

---

[14]     Exhibit A, p. 60.
[15]     Exhibit C, Kemp Deposition, pp. 17, 19.
[16]     Exhibit C, pp. 17-18.
[17]     Exhibit C, pp. 19-20.
[18]     Exhibit C, pp. 26-27.
[19]     Exhibit C, p. 20; Exhibit B and its attached exhibit 3 (Kemp's Employee Mini File). To note, Kemp filed his Consent to Join on September 27, 2017. (Dkt. 35, Notice of Filing Consent.) As a result, the applicable statute of limitations for Kemp's maximum period of recovery is from September 27, 2014, through the end of his employment on May 4, 2019. 29 U.S.C. §255(a). Out of an abundance of caution, by using a three (3) year statute of limitations in connection with the Motion, Smith does not concede that it acted willfully under the FLSA such that the three (3) statute of limitations applies.
[20]     Exhibit C, p. 27.
[21]     Exhibit C, p. 30.

22.     These job bonuses were non-discretionary, and the only requirement for Kemp to earn a job bonus was to work on a drilling rig for a day.[22]

23.     For 2014, Kemp's total annual compensation was approximately $214,044.61.[23]

24.     For 2015, Kemp's total annual compensation was approximately $208,050.10.[24]

25.     For 2016, Kemp's total annual compensation was approximately $143,600.10.[25]

26.     For 2017, Kemp's total annual compensation was approximately $149,196.25.[26]

27.     For 2018, Kemp's total annual compensation was approximately $165,732.12.[27]

**C.  Plaintiffs' Job Duties as Reamers.**

28.     As Reamers, Plaintiffs' primary duty was to supervise Smith's customers' use of the underreaming tool.[28]

29.     Underreaming enlarges the diameter of the well bore initially created by the drill bit.[29]

30.     Plaintiffs' primary duties involved: 1)supervising the rig crew as they attach and remove the reamer tool to/from the drill string,  2)communicating with and instructing the Driller (Smith's customer's employee who operated the controls for the drill string) on how to properly operate the underreaming tool, 3) ensuring that the Driller operated the tool within the appropriate parameters, and 4) ensuring that the Driller did not operate the underreaming tool in a manner that would damage the well that Smith's customer was drilling.[30]

---

[22]     Exhibit C, pp. 30-31.
[23]     Exhibit C, pp. 32-35.
[24]     Exhibit C, pp. 32-35.
[25]     Exhibit C, pp. 32-35.
[26]     Exhibit C, pp. 32-35.
[27]     Exhibit C, pp. 32-35.
[28]     Exhibit D, Declaration of Jack Venable, ¶ 8, which was attached as Exhibit 17 to Venable's Deposition, Exhibit C, pp. 43-44, 58; Exhibit D, ¶ 8.
[29]     Exhibit E, Louback Decl. at ¶ 3.
[30]     Exhibit A, pp. 96, 114; Exhibit C, pp. 42-47.

31.     Plaintiffs did not actually operate the underreaming tool. [31]

32.     In fact, Plaintiffs (and other Reamers) were not allowed to operate the rig's equipment. The Driller was the individual at the controls of and operating the drill string.[32]

33.     Plaintiffs "set the standard on what [the Driller] can do, and … [he] [is] also there to change things as [they] need to change them, and that could be by the minute."[33]

34.     They also "would give the driller . . . his parameters her had to stay in of what the tool was capable of doing . . ."[34]

35.     The main job of a Reamer while on an oil rig is "assist[ing] [Smith's client] in the drilling operations and mak[ing] sure that [the Driller] is running [the] tool correctly . . . and supporting [the customer's use of the underreaming] tool . . . ."[35]

36.     When Plaintiffs arrived on a rig for a job, their first task was to locate the underreaming tool on the rig and then "make sure everything's there, not broken, [and] take inventory."[36]

37.     Plaintiffs then discussed the job with the client's representative and checked out their tools.[37]

38.     Plaintiffs were responsible for managing and controlling the inventory with respect to the underreaming tool.[38]

---

[31]     Exhibit A, pp. 92-93, 138; Exhibit C, p. 47.
[32]     Exhibit A, pp. 92-93, 138; Exhibit C, p. 47.
[33]     Exhibit A, p. 92.
[34]     Exhibit C, p. 43.
[35]     Exhibit A, p. 100; Exhibit C, p. 45.
[36]     Exhibit A, p. 81.
[37]     Exhibit C, p. 51.
[38]     Exhibit A, pp. 111-112.

39.     They had to ensure that they had the tools and parts that were needed and that would be needed as drilling operations moved forward; They had to stay "two or three steps ahead of the drilling process."[39]

40.     As Smith's customers drilled ahead, sometimes the tools and parts that needed to be part of the inventory "change[d] sometimes, … -- because there's nothing constant in drilling."[40]

41.     The actual drilling conditions, changes in formation, and other factors may lead to a change in the drilling plan and "once the decision [of what changes to make] is made, [Plaintiffs] [had] to hurry up and order new tools, inspect new tools because … everything's new."[41]

42.     Venable and Kemp then would take numerous measurements of the various components of the underreaming tool.[42]

43.     Taking all the necessary measurements took from one to two-hours for Venable to complete and two to three hours for Kemp to complete.[43]

44.     The underreaming tool then needed to be assembled.[44]

45.     Plaintiffs performed the initial connecting of the components of the underreaming tool, ensuring that they were in the correct order.[45]

46.     The rig crew then tightened the connections to the required torques.[46]

---

[39]     Exhibit A, pp. 111-112.
[40]     Exhibit A, p. 112.
[41]     Exhibit A, p. 112.
[42]     Exhibit A, pp. 101-102; Exhibit C, p. 43. This process is typically referred to as "strapping" the tool.
[43]     Exhibit A, p. 102; Exhibit C, pp. 50-51.
[44]     Exhibit A, pp. 102-103; Exhibit C, p. 43-45, 51-53.
[45]     Exhibit A, pp. 113-114.  Kemp technique was to assist the rig crew in assembling the reamer portion of the BHA if the rig allowed him.  Exhibit C, p. 44.
[46]     Exhibit A, p. 114:18-25.

47.     Venable supervised the rig crew performing this task to make sure that the rig crew did it correctly and that they put the correct amount of torque onto the connections.[47]

48.     Plaintiffs would then supervise and instruct the rig crew as they used a crane to lower the drill string into the well bore.

49.     Plaintiffs would monitor different parameters and instruct the Drillers to make adjustments to ensure that the underreaming tool did not activate prematurely.[48]

50.     Monitoring to make sure that the tool did not activate prematurely was an important to prevent the tool activate prematurely which could cause significant damage to the well.[49]

51.     Plaintiffs spent the majority of their time on the rig providing services in connection with Smith's customers' drilling operations; they were "supervis[ing] the drilling process."[50]

52.     Plaintiffs had to "pay close attention," and they would tell "[the Driller] how fast to spin [the underreaming tool] …, how much weight to put on the [underreaming] tool" and would make "sure that the [Driller] was running the tool at the correct speeds."[51]

53.     Plaintiffs constantly monitored the various drilling parameters and provided instructions or recommendations to the Driller on adjustments to the drilling parameters in order to maximize the efficiency of the underreaming tool's operation.[52]

54.     Plaintiffs used their experience to rapidly determine the proper adjustments to the applicable drilling parameters and to quickly instruct the Driller on what actions to take to respond to unforeseen situations.[53]

---

[47]     *Id.*
[48]     Exhibit A, pp. 82, 116, 117; Exhibit C, pp. 43, 58.
[49]     Exhibit A, p. 82.
[50]     Exhibit A, p. 115; Exhibit D, ¶ 9.
[51]     Exhibit D, ¶ 8.
[52]     Exhibit A, pp. 110, 115, 116; Exhibit C, p. 65.
[53]     Exhibit A, pp. 111-112; Exhibit C, p. 65.

55.    There were no manuals or step-by-step guides that Plaintiffs followed or that dictated the specific changes to the drilling parameters that Plaintiffs would instruct or advise the Driller to make.[54]

56.    With respect to providing instructions or advice on adjusting the drilling parameters, Plaintiffs had to use their judgement to respond to problems."[55]

*/s/Bryan Edward Bowlder*
Samuel Zurik III (LA Bar #24716)
Robert P. Lombardi (LA Bar #26387)
Bryan Edward Bowdler (LA Bar #32097)
**THE KULLMAN FIRM, P.L.C.**
1100 Poydras Street, Suite 1600
New Orleans, LA  70163
Telephone: (504) 524-4162
Facsimile: (504) 596-4189
E-Mail: sz@kullmanlaw.com
E-Mail: rpl@kullmanlaw.com
E-Mail: beb@kullmanlaw.com

**ATTORNEYS FOR DEFENDANT, SMITH INTERNATIONAL, INC.**

---

[54]    Exhibit A, p. 118.
[55]    Exhibit A, p. 117.