# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE DIVISION

| | | |
|---|---|---|
| **JACK VENTON VENABLE, JR., and** | § | |
| **WILLIAM AGUIRRE, individually and on** | § | **Civil Action No. 6:16-cv-00241** |
| **behalf of all others similarly situated,** | § | |
| | § | |
| **Plaintiff,** | § | **Judge Robert R. Summerhays** |
| | § | |
| **v.** | § | **Magistrate Patrick J. Hanna** |
| | § | |
| **SCHLUMBERGER LIMITED** | § | |
| **(SCHLUMBERGER N.V.) fka SMITH** | § | |
| **INTERNATIONAL, INC.** | § | |
| | | |
| **Defendant.** | | |

**DEFENDANT SMITH INTERNATIONAL, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF JACK VENTON VENABLE, JR. AND BRENT KEMP**

## TABLE OF CONTENTS

INTRODUCTION..........................................................................................................................1

FACTUAL BACKGROUND ........................................................................................................ 2

    A.  Venable's Employment with Smith and Compensation........................................................ 2

    B.  Kemp's Employment with Smith and Compensation. ........................................................ 3

    C.  Plaintiffs' Job Duties as Reamers........................................................................................ 5

LAW AND ANALYSIS .............................................................................................................. 8

    A.  Rule 56 Standard for Summary Judgment. ........................................................................ 8

    B.  Smith Properly Classified Plaintiffs as Exempt From Overtime Pursuant to the HCE. ...... 10

        1.  The Requirements of the HCE. ................................................................................... 10

        2.  Plaintiffs' Compensation Satisfied Both the HCE's Total Annual Compensation and Minimum Weekly Salary Guarantee Requirements. .................................................... 11

        3.  Plaintiffs' Primary Duties Were Non-Manual in Nature. .......................................... 12

        4.  Plaintiffs Regularly and Customarily Performed the Exempt Work of an Administrative Employee. ................................................................................................................... 14

CONCLUSION ......................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Coil Tubing Servs., L.L.C.*, 755 F.3d 279 (5th Cir. 2014) .......................................... 10

*Allen v. Coil Tubing Servs., L.L.C.,* 846 F. Supp. 2d 678 (S.D. Tex. 2012)........................... 14

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ...................................................................... 9

*Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007) ................................................................... 9

*Boudreaux v. Swift Transp. Co*., 402 F.3d 536 (5th Cir. 2005). ............................................... 9

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945) ............................................................... 10

*Carranza v. Red River Oilfield Servs., LLC*, 15-3631, 2017 WL 1196215 (S.D. Tex. Mar. 31, 2017) ... 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................................... 9

*Cunningham v. Advantix Digital, LLC*, 2020 WL 1915693 (N.D. Tex. Apr. 20, 2020) ....................... 10

*Dewan v. M-I, L.L.C.,* 858 F.3d 331 (5th Cir. 2017) ................................................................ 17

*EEOC v. LHC Grp., Inc*., 773 F.3d 688 (5th Cir. 2014)............................................................. 9

*Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134 (2018) .............................................. 9, 17

*Fields v. City of S. Houston, Tex*., 922 F.2d 1183 (5th Cir. 1991)............................................. 8

*Goulas v. LaGreca,* No. 12–898, 2013 WL 2477030 (E.D. La. June 7, 2013), *aff'd sub nom. Goulas v. LaGreca Servs., Inc.,* 557 F. App'x 337 (5th Cir. 2014)........................................................ 14

*Harris v. Liberty Oilfield Services, LLC*, No. 16-cv-01116-CMA-STV, 2018 WL 447355 (D. Colo. Jan. 17, 2018)................................................................................................................... 17

*Hobbs v. EVO Inc.*, No. 20-20213, - F.4th -, 2021 WL 3161821 (5th Cir. July 27, 2021). ............. 18, 19

*In re RBC Dain Rauscher Overtime Litigation*, 703 F. Supp. 2d 910 (D. Minn. 2010).......................... 14

*Karna v. BP Corp. N. Am*., 12-0101, 2013 WL 1155485 (S.D. Tex. Mar. 19, 2013) .............................. 14

*Kennedy v. Commonwealth Edison Co*., 410 F.3d 365 (7th Cir. 2005).................................................... 15

*Lansford v. RedZone Coil Tubing, LLC*, No. 17-0225, 2019 WL 4999059 (W.D. Tex. July 2019) ........ 14

*Mamola Mfg. Serv., Inc*., No. 08-1687, 2010 WL 1433491 (D. Ariz. Apr. 9, 2010) .............................. 14

*McLendon v. Schlumberger Tech. Corp.*, No. 4:15-cv-752-JLH (E.D. Ark.) .......................................... 14

*Nola Spice Designs, LLC v. Haydel Enters., Inc*., 783 F.3d 527 (5th Cir. 2015) ...................................... 9

*Olibas v. Barclay*, 838 F.3d 442 (5th Cir. 2016) ........................................................................................ 10

*Pruneda v. Xtreme Drilling Coil Serv., Inc.*, 2017 WL 3023214 (W.D. Tex. June 20, 2017) .......... 13, 15

*Pye v. Oil States Energy Servs., LLC*, 15-678, 2017 WL 1944564 (W.D. Tex. Jan. 13, 2017) ................. 8

*Smith v. Ochsner Health Sys.,* 353 F. Supp. 3d 483 (E.D. La. 2018). ................................................ 17, 18

*Smith v. Ochsner Health System*, 956 F.3d 681 (5th Cir. 2020) ........................................................ passim

*Sossamon v. Lone Star State of Texas*, 560 F.3d 316 (5th Cir. 2009).......................................................... 9

*Trahan v. Honghua America, LLC*, No. H-11-2271, 2013 WL 2617894 (S.D. Tex. June 10, 2013) ...... 14

*Trent v. Wade*, 776 F.3d 368 (5th Cir. 2015) ............................................................................................. 8

*Zannikos v. Oil Inspections (U.S.A.), Inc.*, 605 F. App'x 349 (5th Cir. 2015) ........................................ 16

*Zannikos v. Oil Inspections (U.S.A.), Inc.*, No. 12-2508, 2014 WL 12771511 (S.D. Tex. Jan. 30, 2014)16

**Statutes**

29 U.S.C. § 202 ........................................................................................................................................ 10

29 U.S.C. § 207 ........................................................................................................................................ 10

**Rules**

Fed. R. Civ. P. 56 ....................................................................................................................................... 8

**Regulations**

29 C.F.R. § 541.200 ................................................................................................................................. 15

29 C.F.R. § 541.201 ................................................................................................................................. 15

29 C.F.R. § 541.205 ................................................................................................................................. 15

29 C.F.R. § 541.601 ........................................................................................................................... passim

29 C.F.R. § 541.602 ................................................................................................................................. 12

29 C.F.R. § 541.701 ............................................................................................................................ 15, 20

29 C.F.R. 541.602 .................................................................................................................................... 12

Defendant Smith International, Inc. ("Smith" or "Defendant") submits its Memorandum in Support of its Motion for Summary Judgment as to Plaintiffs Jack Venable, Jr. and Brent Kemp (the "Motion). For the reasons set forth below, the Court should grant the Motion and dismiss Plaintiffs' claims with prejudice.

## **INTRODUCTION**

This case involves the claims of two individuals who were very highly compensated, but, despite their high level of compensation, filed this lawsuit alleging that they were entitled to additional compensation; specifically, they allege that they should have been paid overtime compensation for hours worked over 40 in a workweek. Venable and Kemp, however, were not and are not entitled to overtime compensation as they were properly classified as exempt pursuant to the Fair Labor Standards Act's (the "FLSA") Highly Compensated Employee exemption (the "HCE") exemption.

Venable earned $300,000 (or more), and Kemp earned $140,000 (or more), in total annual compensation for each full year they were employed during the relevant period, of which at least was $455.00 per week on a salary basis. Venable's and Kemp's formal job title was DT&R Field Specialist, they worked at Smith's customers' drilling rigs, and their primary duty involved supervising, directing, and advising Smith's customers' operation of Smith's underreamer drilling tool during underreaming operations. Accordingly, Venable and Kemp satisfy all of the requirements of the HCE, and they were properly classified as exempt.

## FACTUAL BACKGROUND

**A.  Venable's Employment with Smith and Compensation.**

Venable was employed with Smith from July 2012 until approximately September 25, 2015, when his employment was terminated as part of a reduction in force.[1] During this time, Venable's initial job title was SERVCO Field Specialist, and later changed to DTR Field Specialist.[2] Despite this change in job titles, Venable's job duties remained the same.[3] Venable worked as a "Reamer."[4] Other than a few "whipstock" jobs early in his employment, Venable performed the Reamer job duties during his entire employment with Smith.[5]

Venable was paid on a salary basis during his employment with Smith. Specifically, Venable received a guaranteed base salary that was not subject to reduction based on the quality or quantity of work.[6] Venable's annual salary was $56,700.00 (or $1,909.38 per week) from February 2013 through August 2013, $58,450.00 (or $1,124.04 per week) from August 2013 through August 2014, and $60,250.00 (or $1,164.42 per week) from August 2014 through September 2015 when Venable's employment with Smith ended.[7] Smith paid Venable his base salary every week regardless of the number of hours Venable worked.[8] Indeed, Venable received his base salary for weeks in which he did not work at all.[9]

---

[1]	Exhibit A, Venable Deposition, pp. 33, 49, 60.

[2]	Exhibit A, pp. 36-38.

[3]	*Id.*

[4]	Exhibit A, pp. 38, 42, 79, 87.

[5]	*Id.*

[6]	Exhibit A, pp. 37-39, 52-53.

[7]	Exhibit A, pp. 39; Declaration of B. Marroquin, attached as Exhibit B, at its attached exhibit 6. To note, Venable filed his Complaint on February 22, 2016. (Dkt. 1, Complaint.) As a result, the applicable statute of limitations for Venable's maximum period of recovery is from February 22, 2013, through the end of his employment in September 2015. 29 U.S.C. §255(a). Out of an abundance of caution, by using a three (3) year statute of limitations in connection with the Motion, Smith does not concede that it acted willfully under the FLSA such that the three (3) statute of limitations applies.

[8]	Exhibit A, p. 53.

[9]	*Id.*

In addition to his base salary, Venable received job bonuses for days he provided services to Smith's customers on their drilling rigs.[10] The amount of the job bonus differed based on various factors.[11] These job bonuses were non-discretionary, and the only requirement for Venable to earn a job bonus was to work on a drilling rig for a day.[12]

In 2013, Venable's total annual compensation was approximately $300,060.64.[13] In 2014, Venable's total annual compensation was approximately $319,264.42.[14] For the approximately nine (9) month period during which he was employed in 2015, Venable's total annual compensation was approximately $168,787.67.[15]

By way of summary:

| Year | Annual Salary | Total Annual Compensation |
|------|---------------|---------------------------|
| 2013 | • $56,700.00 ($1,909.38 per week) (Feb. 2013-Aug. 2013) <br> • $58,450.00 ($1,124.04 per week) (Aug. 2013-Dec. 2013) | $300,060.64 |
| 2014 | • $58,450.00 ($1,124.04 per week) (Jan. 2014-Aug. 2014) <br> • $60,250.00 ($1,164.42 per week) (Aug. 2014-Dec. 2014) | $319,264.42 |
| 2015 (Jan.-Sept. 25) | • $60,250.00 | $168,787.67 |

**B. Kemp's Employment with Smith and Compensation.**

Kemp began his employment with Smith in 2005 and remained employed by Smith until May 4, 2019, when he voluntarily resigned.[16] During this time, Kemp served as a DTR Field Specialist, which is

---

[10]    Exhibit A, p. 54.
[11]    Exhibit A, pp. 54-55.
[12]    *Id*.
[13]    Exhibit A, p. 57.
[14]    Exhibit A, pp. 58-59.
[15]    Exhibit A, p. 60.
[16]    Exhibit C, Kemp Deposition, pp. 17, 19.

also referred to as a "reamer hand."[17] Other than a few "whipstock" jobs, Kemp performed the Reamer

job duties during his entire employment with Smith.[18]

      Kemp was paid on a salary basis during his employment with Smith. Specifically, Kemp received

a guaranteed base salary that was not subject to reduction based on the quality or quantity of work.[19]

Kemp's annual salary was $54,700.00 (or $1,051.92 per week).[20] Smith paid Kemp his base salary every

week regardless of the number of hours Kemp worked.[21]

      In addition to his base salary, Kemp received job bonuses for days he provided services to Smith's

customers on their drilling rigs.[22] These job bonuses were non-discretionary, and the only requirement for

Kemp to earn a job bonus was to work on a drilling rig for a day.[23]

      From 2014-2018, Kemp's total annual compensation was approximately $214,044.61,

$208,050.10, $143,600.10, $149,196.25, and $165,732.12, respectively.[24]

      By way of summary:

| Year | Annual Salary | Total Annual Compensation |
| --- | --- | --- |
| 2014 | $54,700 | $214,044.61 |
| 2015 | | $208,050.10 |
| 2016 | | $143,600.10 |
| 2017 | | $149,196.25 |
| 2018 | | $165,732.12 |

---

[17]     Exhibit C, pp. 17-18.
[18]     Exhibit C, pp. 19-20.
[19]     Exhibit C, pp. 26-27.
[20]     Exhibit C, p. 20; Exhibit B, at attached exhibit 3 (Kemp's Employee Mini File) To note, Kemp filed his Consent to Join on September 27, 2017. (Dkt. 35, Notice of Filing Consent.) As a result, the applicable statute of limitations for Kemp's maximum period of recovery is from September 27, 2014, through the end of his employment on May 4, 2019. 29 U.S.C. §255(a). Out of an abundance of caution, by using a three (3) year statute of limitations in connection with the Motion, Smith does not concede that it acted willfully under the FLSA such that the three (3) statute of limitations applies.
[21]     Exhibit C, p. 27.
[22]     Exhibit C, p. 30.
[23]     Exhibit C, pp. 30-31.
[24]     Exhibit C, pp. 32-35.

### C. Plaintiffs' Job Duties as Reamers.

As Reamers, Plaintiffs' primary duty was to supervise Smith's customers' running of drilling tools.[25] Specifically, Plaintiffs supervised Smith's customer's use of a underreaming tool.[26] Underreaming enlarges the diameter of the well bore initially created by the drill bit.[27] Plaintiffs' primary duties as a Reamer involved supervising the rig crew as they attach and remove the reamer tool to/from the drill string, communicating with and instructing the Driller (Smith's customer's employee who operated the controls for the drill string) on how to properly operate the underreaming tool, ensuring that the Driller operated the tool within the appropriate parameters, and that the Driller did not operate the underreaming tool in a manner that would damage the well that Smith's customer was drilling.[28]

Importantly, Plaintiffs did not actually operate the underreaming tool; the Driller was the individual at the controls of and operating the drill string.[29] In fact, Plaintiffs (and other Reamers) were not allowed to operate the rig's equipment.[30] As the Reamers, Plaintiffs "set the standard on what [the Driller] can do, and … [he] [is] also there to change things as [they] need to change them, and that could be by the minute."[31] They also "would give the driller . . . his parameters her had to stay in of what the tool was capable of doing . . ."[32] The main job of a Reamer while on an oil rig is "assist[ing] [Smith's client] in the drilling operations and mak[ing] sure that [the Driller] is running [the] tool correctly . . . and supporting [the customer's use of the underreaming] tool . . . ."[33]

---

[25]   Exhibit D, Declaration of Jack Venable, ¶ 8, which was attached as Exhibit 17 to Venable's Deposition.  The copy of Exhibit D attached to the Motion has been redacted to prevent the public disclosure of Venable's sensitive, personal medical information.  If the Court would like to review an unredacted copy of Exhibit D, Smith will provide it to the Court.
[26]   Exhibit C, pp. 43-44, 58; Exhibit D, ¶ 8.
[27]   Declaration of L. Louback, at ¶ 3, attached as Exhibit E.
[28]   Exhibit A, pp. 96, 114; Exhibit C, pp. 42-47.
[29]   Exhibit A, pp. 92-93, 138; Exhibit C, p. 47.
[30]   Exhibit A, p. 92.
[31]   Exhibit A, p. 92.
[32]   Exhibit C, p. 43.
[33]   Exhibit A, p. 100; Exhibit C, p. 45.

When Plaintiffs arrived on a rig for a job, their first task was to locate the underreaming tool on the rig and then "make sure everything's there, not broken, [and] take inventory."[34] They also had to discuss the job with the client's representative and checked out their tools.[35] From there, they were responsible for managing and controlling the inventory with respect to the underreaming tool.[36] They had to ensure that they had the tools and parts that were needed and that would be needed as drilling operations moved forward; They had to stay "two or three steps ahead of the drilling process."[37] As Smith's customers drilled ahead, sometimes the tools and parts that needed to be part of the inventory "change[d] sometimes, … -- because there's nothing constant in drilling."[38] The actual drilling conditions, changes in formation, and other factors may lead to a change in the drilling plan and "once the decision [of what changes to make] is made, [Plaintiffs] [had] to hurry up and order new tools, inspect new tools because … everything's new."[39]

After conducting these initial steps, Venable and Kemp then would take numerous measurements of the various components of the underreaming tool.[40] Taking all the necessary measurements took from one to two-hours for Venable to complete and two to three hours for Kemp to complete.[41]

The underreaming tool then needed to be assembled.[42] Plaintiffs performed the initial connecting of the components of the underreaming tool, ensuring that they were in the correct order.[43] From there, the rig crew took over the assembly of the underreaming tool. The rig crew then tightened the connections to the required torques.[44] Venable supervised the rig crew performing this task to make sure that the rig crew did it correctly and that they

---

[34]    Exhibit A, p. 81.
[35]    Exhibit C, p. 51.
[36]    Exhibit A, pp. 111-112.
[37]    Exhibit A, pp. 111-112.
[38]    Exhibit A, p. 112.
[39]    Exhibit A, p. 112.
[40]    Exhibit A, pp. 101-102; Exhibit C, p. 43. This process is typically referred to as "strapping" the tool.
[41]    Exhibit A, p. 102; Exhibit C, pp. 50-51.
[42]    Exhibit A, pp. 102-103; Exhibit C, p. 43-45, 51-53.
[43]    Exhibit A, pp. 113-114.  Kemp technique was to assist the rig crew in assembling the reamer portion of the BHA if the rig allowed him.  Exhibit C. p. 44.
[44]    Exhibit A, p. 114:18-25.

put the correct amount of torque onto the connections.[45] "[E]very time something [was] screwed together, [Venable] [had] to be there."[46]

The rig crew then would pick-up the drill string using a crane and begin lowering it into the well bore. Then, the drill string would "trip in hole," which is lowering the drill string through the previously drilled portion of the well bore to the depth where Smith's client would begin operating the underreaming tool. While the drilling string trips into the well bore, Plaintiffs were on the rig floor monitoring different parameters to make sure that the underreaming tool did not activate prematurely and providing instructions to the Driller to ensure that it did not occur.[47] They would observe, analyze, record and report the data.[48] After analyzing the different sources of data, if a Reamer saw that the data suggested that the underreaming tool activated prematurely, he would alert the Driller.[49] Monitoring to make sure that the tool did not activate prematurely was an important part of the job, because if the tool did activate prematurely, it "can do a lot of damage" to the well.[50]

Plaintiffs spent the majority of their time on the rig providing services in connection with Smith's customers' drilling operations; they were "supervis[ing] the drilling process."[51] During drilling operations, Plaintiffs had to "pay close attention," and they would tell "[the Driller] how fast to spin [the underreaming tool] …, how much weight to put on the [underreaming] tool" and would make "sure that the [Driller] was running the tool at the correct speeds."[52] Plaintiffs constantly monitored the various drilling parameters and provided instructions or recommendations to the Driller on adjustments to the drilling parameters in order to maximize the operation of the underreaming tool's operation.[53] "[S]ome of these adjustments happen quickly."[54] As Venable stated, "when you're drilling … thousands of feet, but within that thousand feet, you might have … just … a little strip of sand that—it

---

[45]    *Id.*
[46]    Exhibit A, p. 114.
[47]    Exhibit A, pp. 82, 116, 117; Exhibit C, pp. 43, 58.
[48]    Exhibit C, p. 65; Exhibit D, ¶ 8.
[49]    Exhibit A, pp. 116-117.
[50]    Exhibit A, p. 82.
[51]    Exhibit A, p. 115; Exhibit D, ¶ 9.
[52]    Exhibit D, ¶ 8.
[53]    Exhibit A, pp. 110, 115, 116; Exhibit C, p. 65.
[54]    Exhibit A, p. 111.

might be only ten feet of sand and you're drilling through [shale] and … like pff, [the drill] ain't going nowhere."[55] When this happens Plaintiffs had to determine the proper adjustments to the applicable drilling parameters based on his experience, and quickly instruct the Driller on what actions to take and he often had to do so quickly in order to respond to unforeseen situations.[56]

There were no manuals or step-by-step guides that Plaintiffs followed or that dictated the specific changes to the drilling parameters that Plaintiffs would instruct or advise the Driller to make.[57] With respect to providing instructions or advice on adjusting the drilling parameters, they had "to look … everything going on and use[d] [his] judgment to try and guess what the problem is and try different things to solve the problems."[58]

Smith's clients for whom Plaintiffs provided services were primarily oil and gas exploration companies.[59] The business goal of STC's clients is to produce either oil or natural gas. Plaintiffs, as Reamers, provided services to Smith's clients operations to drill a well that would produce oil and/or natural gas.[60]

## LAW AND ANALYSIS

### A. Rule 56 Standard for Summary Judgment.

Summary judgment motions permit the Court to resolve a lawsuit, or individual legal issues/claims in a lawsuit, without the necessity of a trial if there is no genuine dispute as to any material facts and the moving party is entitled to judgment as a matter of law.[61] "Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[62] "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the

---

[55]   Exhibit A, p. 111.
[56]   Exhibit A, pp. 111-112; Exhibit C, p. 65.
[57]   Exhibit A, p. 118.
[58]   Exhibit A, p. 117.
[59]   Exhibit A, pp. 89-90; Exhibit C, p. 63.
[60]   Exhibit A, p. 90; Exhibit C, p. 64.
[61]   *See Pye v. Oil States Energy Servs., LLC*, 15-678, 2017 WL 1944564, at *3 (W.D. Tex. Jan. 13, 2017) (citing *Fields v. City of S. Houston, Tex.*, 922 F.2d 1183, 1187 (5th Cir. 1991)).
[62]   *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)).

nonmoving party.'"[63] "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'"[64]

Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.[65] "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."[66]

Once the moving party [meets its initial burden], the nonmoving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'"[67] The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.[68] "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"[69]

In 2018, the United States Supreme Court expressly rejected the principle applied by courts that exemptions to overtime pay requirements should be construed narrowly.[70] The Court explicitly stated: "[t]he Ninth Circuit also invoked the principle that exemptions to the FLSA should be construed narrowly. We reject this principle as a useful guidepost for interpreting the FLSA."[71] Thus, according to the U.S. Supreme Court, exemptions must be given a fair reading, as opposed to subjecting employers to a heightened burden under the overruled narrow-construction principle. *Id.*

---

[63]     *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).
[64]     *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[65]     *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).
[66]     *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009).
[67]     *Nola Spice* 783 F.3d at 536 (quoting *LHC Grp.*, 773 F.3d at 694).
[68]     *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).
[69]     *Boudreaux*, 402 F.3d at 540 (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)) (emphasis added).
[70]     *Encino Motorcars, LLC v. Navarro*, 138 S.Ct. 1134, 1142 (2018).
[71]     *Id.*

**B.   Smith Properly Classified Plaintiffs as Exempt From Overtime Pursuant to the HCE.**

At a minimum, Plaintiffs were exempt from overtime pursuant to the HCE. During the relevant time period, Venable and Kemp easily satisfied the compensation requirements of the HCE. Further, Venable's and Kemp's primary duties involved non-manual labor, and they regularly and customarily performed at least one exempt duty. There are no issues of material fact on these points, and the Court should grant the Motion.

**1.   The Requirements of the HCE.**

The FLSA established minimum labor standards in order to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers."[72] The statute was designed to "aid the unprotected, unorganized, and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage."[73] This typically includes paying overtime to any employee working more than forty hours in a week."[74] However, the FLSA provides exemptions to the overtime requirements including an exemption for highly compensated employees.[75]

An FLSA plaintiff is properly classified under the HCE if he: (1) earns total annual compensation of at least $100,000.00 (which must include at least $455.00 per week paid on a salary or fee basis), (2) customarily and regularly performs any one of the exempt duties of an executive, administrative, or professional employee; and (3) primarily performs office or non-manual work.[76] According to the DOL, "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job

---

[72]    29 U.S.C. § 202(a).

[73]    *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n18 (1945).

[74]    *Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016) (quoting *Allen v. Coil Tubing Servs., L.L.C.*, 755 F.3d 279, 282 (5th Cir. 2014) (citing 29 U.S.C. § 207 (a)(1))).

[75]    *Cunningham v. Advantix Digital, LLC*, 2020 WL 1915693, at *16 (N.D. Tex. Apr. 20, 2020).

[76]    29 C.F.R. § 541.601; *Smith v. Ochsner Health System*, 956 F.3d 681, 684 (5th Cir. 2020).

duties."[77] Indeed, "[i]n crafting the highly compensated employee exemption, the Department of Labor made it easier on both employers and courts."[78] The employee's "level of compensation is the principal consideration."[79]

When determining whether an employee's compensation satisfies the HCE exemption's requirements, total annual compensation may include commission payments, nondiscretionary bonuses, and other nondiscretionary compensation.[80] If the employer does not define the applicable year in advance, the calendar year applies.[81]

### 2. Plaintiffs' Compensation Satisfied Both the HCE's Total Annual Compensation and Minimum Weekly Salary Guarantee Requirements.

With respect to the total annual compensation requirement, during the applicable time-period, Venable earned total annual compensation of approximately $300,060.64 in 2013;[82] total annual compensation of approximately $319,264.42 in 2014;[83] and total annual compensation of approximately $168,787.67 for the nine (9) months he worked in 2015.[84] From 2014-2018, Kemp earned total annual compensation of $214,044.61, $208,050.10, $143,600.10, $149,196.25, and $165,732.12, respectively.[85] Not only do Venable's and Kemp's total annual compensations satisfy the HCE's $100,000.00 total annual compensation requirement, their total annual compensation well exceeded that amount, and in some instances, was approximately three (3) times that amount.[86]

With respect to the salary basis requirement of the HCE, 29 C.F.R. 541.602(a) defines what constitutes being paid on a salary basis. Per the regulation, an employee is paid on a salary basis when the employee "regularly

---

[77]     29 C.F.R. § 541.601 (c).
[78]     *Smith*, 956 F.3d at 688.
[79]     *Id*.
[80]     29 C.F.R. § 541.601(b).
[81]     29 C.F.R. § 541.601(b)(3).
[82]     Exhibit A, p. 57.
[83]     Exhibit A, p. 58-59.
[84]     Exhibit A, p. 60. Assuming Venable worked all of 2015, he likely would have earned approximately $230,972.60 in total compensation.
[85]     Exhibit C, pp. 32-35.
[86]     For comparison, U.S. District Court Judges' salary was $174,000 per year in 2013, $199,100.00 per year in 2014, and $201,100.00 in 2015. *Available at* https://www.uscourts.gov/judges-judgeships/judicial-compensation (last visited June 15, 2021).

receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variation in the quality or quantity performed."[87] Further, an exempt employee must "receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked."[88] During the relevant time period, the HCE's salary basis requirement provided for a minimum weekly pay of $455.00 per week.

Plaintiffs received a guaranteed base salary that was not subject to reduction based on the quality or quantity of work.[89] Venable's annual salary was $56,700.00 (or $1,909.38 per week) from February 2013 through August 2013, $58,450.00 (or $1,124.04 per week) from August 2013 through August 2014, and $60,250.00 (or $1,164.42 per week) from August 2014 through September 2015 when Venable's employment with Smith ended.[90] Kemp's was $54,700.[91] Smith paid Venable and Kemp their base salary every week regardless of the number of hours they worked.[92] Further, Smith did not take any deductions from Venable's or Kemp's base salary.[93] The salary basis requirement is satisfied as well.

### 3. Plaintiffs' Primary Duties Were Non-Manual in Nature.

Next, to qualify for the HCE, the employee's primary duty must include performing office or non-manual labor.[94] Their primary duty as a Reamer was to "supervise [Smith's customers'] running of drilling tools," which included monitoring, analyzing, and recording information.[95] When fulfilling their primary duties, both Venable and Kemp communicated with and instructed the Driller on how to properly operate the underreaming tool, ensuring

---

[87]     29 C.F.R. 541.602(a).
[88]     29 C.F.R. § 541.602(a)(1).
[89]     Exhibit C, pp. 26-27.
[90]     Exhibit A, p. 39.
[91]     Exhibit C, p. 20; Exhibit B.
[92]     Exhibit C, p. 27.
[93]     Exhibit C, p. 27.
[94]     29 C.F.R. § 541.601.
[95]     Exhibit C, p. 65; Exhibit D, ¶ 8.

that the Driller operated the tool within the appropriate parameters, and that the Driller did not operate the underreaming tool in a manner that would damage the well that Smith's customer was drilling.[96]

Plaintiffs' main job was "assist[ing] [Smith's client] in the drilling operations and mak[ing] sure that [the Driller] is running [the] tool correctly, . . . and supporting [the customer's use of the underreaming] tool ...."[97] These primary duties required Venable and Kemp to monitor the various drilling parameters and provide instructions or recommendations to the Driller on adjustments to the drilling parameters in order to maximize the operation of the underreaming tool's operation.[98] Monitoring data and providing direction and/or advice is not manual labor.

The limited manual labor that Plaintiffs performed, primarily correctly lining up the tool sections before runs, does not change this conclusion.[99] In the context of the HCE, court routinely hold that performing some manual labor does not negate the exemption when the employee's primary duty is exempt work. For example, in *Pruneda v. Xtreme Drilling Coil Serv., Inc.,* the plaintiffs who were "service supervisors," argued that they were misclassified as exempt from overtime because they performed manual labor, including loading and securing tools and equipment, physically inspecting work trucks, setting up equipment, rigging up the equipment, swinging a hammer, operating a forklift and winch, wiping down tools, cleaning up, examining the equipment, monitoring gauges, repairing leaks, assisting their crew in operating the equipment, and making necessary repairs.[100] Despite their performance of such manual work, the Court held that the plaintiffs were exempt HCE employees because while the plaintiffs performed some manual labor as "*part of* their duties," their "*primary duty* was management, as defined by the FLSA's implementing regulations."[101]

---

[96]     Exhibit A, pp. 96, 114; Exhibit C, pp. 42-47.
[97]     Exhibit A, p. 100.
[98]     Exhibit A, pp. 110-117; Exhibit C, p. 95-96.
[99]     Presumably, Plaintiffs will argue in opposition that their primary duties were manual in nature because they performed some manual labor while on Smith's clients' drilling rigs. However, the mere fact that an exempt employee performs *some* manual work does not convert that employee to a non-exempt laborer. For the HCE, what matters is whether Plaintiffs' *primary* duty (not all of their duties) includes (but is not exclusively) office or non-manual labor.
[100]    *Pruneda v. Xtreme Drilling Coil Serv., Inc.*, 2017 WL 3023214 (W.D. Tex. June 20, 2017).
[101]    *Id.* at *7 (emphasis added).

In *Lansford v. RedZone Coil Tubing, LLC*, the plaintiffs (also "service supervisors") argued they were misclassified as exempt, in part, because they performed "strenuous manual labor."[102] However, the employer put forth significant evidence showing that such manual labor was not the plaintiffs' primary duty.[103] The Court held that, even though the plaintiffs performed manual labor, their primary duty (managing the crew) was exempt and what gave the employer the most value.[104]

The fact that the employee performs some manual labor does not preclude a finding that the plaintiff's primary duty was exempt.[105]

### 4.      Plaintiffs Regularly and Customarily Performed the Exempt Work of an Administrative Employee.

The "primary duty" analysis is not relevant to the analysis of whether an employee qualifies for the HCE.[106] The HCE does not require the Court to engage in a rigorous analysis of the Plaintiffs' job duties.[107] Under the HCE exemption, it is not necessary to prove that an employee performed each requirement of the executive, administrative or professional exemptions.[108]

---

[102]      No. 17-0225, 2019 WL 4999059 (W.D. Tex. July 2019)
[103]      *Id.* at *3.
[104]      *Id.* at *4.
[105]      *See also Smith v. Ochsner Health Sys.*, 956 F.3d 681, 687 (5th Cir. 2020) (holding that plaintiff was exempt under HCE despite that the plaintiff "spent literal procurement time on the ground, taking [a] team to the airport, going into the operating room, and reporting back to the coordinator and surgeon in Louisiana."); *Goulas v. LaGreca*, No. 12–898, 2013 WL 2477030 at *9 (E.D. La. June 7, 2013), *aff'd sub nom. Goulas v. LaGreca Servs., Inc.,* 557 F. App'x 337 (5th Cir. 2014) (superintendent of horizontal drilling crew was exempt executive "despite the inclusion of manual labor in his regular duties"); *Allen v. Coil Tubing Servs., L.L.C.,* 846 F. Supp. 2d 678, 695 (S.D. Tex. 2012), *aff'd,* 755 F.3d 279 (5th Cir. 2014) (coil tubing supervisor was exempt executive even though he "also performed manual labor alongside the [technicians] he supervised while in the field"); *McLendon v. Schlumberger Tech. Corp.*, No. 4:15-cv-752-JLH, Dkt. No. 58, at pp. 2-4 (E.D. Ark. Mar. 13, 2018) (Doc. No. 58 at pp. 2-4) (holding that despite the plaintiff spending hours performing manual work, plaintiff was exempt under the HCE, given that his primary duty was planning the job properly and supervising the proper execution at the well site).
[106]      *In re RBC Dain Rauscher Overtime Litigation*, 703 F. Supp. 2d 910, 943 (D. Minn. 2010); *see also Carranza v. Red River Oilfield Servs., LLC*, 15-3631, 2017 WL 1196215 at *3 (S.D. Tex. Mar. 31, 2017).
[107]      *Karna v. BP Corp. N. Am.*, 12-0101, 2013 WL 1155485 at *17 (S.D. Tex. Mar. 19, 2013); *see also Trahan v. Honghua America, LLC*, No. H-11-2271, 2013 WL 2617894, at *12 (S.D. Tex. June 10, 2013) (citing to 29 C.F.R. § 541.601(c)).
[108]      *See, e.g., Smith*, 956 F.3d at 684; *Mamola Mfg. Serv., Inc.*, No. 08-1687, 2010 WL 1433491 (D. Ariz. Apr. 9, 2010).

Instead, the Court need only find that a highly compensated employee customarily and regularly[109] performs (it need not find it to be the employee's primary duty) **only one** of the exempt duties or responsibilities of an executive, administrative or professional employee.[110]

### a.   Plaintiffs Customarily and Regularly Performed Non-Manual Work Directly Related to the Management or General Business Operations of Smith's Clients.

Plaintiffs regularly performed exempt work under the administrative exemption as they regularly performed "non-manual work directly related to the management or general business operations of the employer or the employer's customers."[111] The phrase "directly related to the management or business operations" refers to the type of work performed by the employee.[112] Administratively exempt employees are those "whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business."[113] The regulations specifically identify quality control and safety as administrative duties qualifying for the exemption.[114] Further, an employee who serves as an advisor and consultant to an employer's customers will also qualify for the exemption.[115]

There is no dispute that Plaintiffs' work directly relates to the general business operations of Smith's customer.[116] Smith's clients for whom provided services were primarily oil and gas exploration companies.[117] The business goal of STC's clients is to produce either oil or natural gas. Plaintiffs, as

---

[109]     In this context, "customarily and regularly performs" means greater than occasional but may be less than constant and includes "work normally and recurrently performed every workweek," but not "isolated or one-time tasks." 29 C.F.R. § 541.701.

[110]     *Id.*; *see also* 29 C.F.R. § 541.601(a) (emphasis added); *Smith*, 956 F.3d at 684; *Pruneda*, 2017 WL 3023214 at *12 (citing 29 C.F.R. § 541.601(c)) ("An employee may qualify as a highly compensated executive employee, for example, if the employee customarily and regularly directs the work of two or more other employees, even though the employee does not meet all of the other requirements for the executive exemption under § 541.100.").

[111]     29 C.F.R. § 541.200(a)(2).

[112]     29 C.F.R. § 541.201(a).

[113]     29 C.F.R. §§ 541.201(a), 541.205(a).

[114]     29 C.F.R. § 541.201(b).

[115]     29 C.F.R. § 541.201(c).

[116]     *Kennedy v. Commonwealth Edison Co*., 410 F.3d 365, 373 (7th Cir. 2005) (distinguishing workers on the production line from those that "spot trouble in advance and decide what steps to take.").

[117]     Exhibit A, pp. 89-90; Exhibit C, p. 63.

Reamers, provided services to Smith's clients operations to drill a well that would produce oil and/or natural gas.[118] As discussed above, Plaintiffs "supervise[d] [Smith's customers'] running of drilling tools offshore,"[119] which included monitoring, analyzing, and recording information pertaining to the drilling process.[120] Plaintiffs both communicated with and instructed the Driller on how to properly operate the underreaming tool, ensuring that the Driller operated the tool within the appropriate parameters, and that the Driller did not operate the underreaming tool in a manner that would damage the well that Smith's customer was drilling.[121] Their main job was assisting Smith's client in the drilling operations and making sure that the Driller ran the tool correctly and supporting the customer's use of the underreaming tool."[122]

Further, Plaintiffs' supervision of the rig crew (and particularly the Driller) when they operated the underreaming tool was another administrative function. In *Zannikos v. Oil Inspections (U.S.A.), Inc.*,[123] the plaintiffs, marine superintendents, argued that the district court erred in finding that they performed non-manual work as they inspected cargo tanks to ensure the absence of contaminants, inspected onshore tank placement to ensure it was correctly placed, inspected loading and discharge equipment, and examined fluid flow through the line to ensure that no oil was lost during oil transfers. In other words, the plaintiff supervised his employer's customer's operations, and this was an administrative task. Concluding that the plaintiff's primary duties included supervision, quality control, and ensuring compliance with applicable standards, the Court affirmed the district court's ruling that the plaintiff was properly classified as exempt under the HCE.[124]

---

[118]    Exhibit A, p. 90; Exhibit C, p. 64.
[119]    Exhibit D, ¶ 8.
[120]    Exhibit C, p. 65.
[121]    Exhibit A, pp. 96, 114; Exhibit C, pp. 42-47.
[122]    Exhibit A, p. 100.
[123]    605 F. App'x 349, 353-54 (5th Cir. 2015).
[124]    As the issue was the highly compensated exemption, the defendant did not need to show that plaintiff exercised other exempt duties such as exercising independent judgment and discretion. *See Zannikos v. Oil Inspections (U.S.A.), Inc.*, No. 12-2508, 2014 WL 12771511 at *5 (S.D. Tex. Jan. 30, 2014), *aff'd* 605 F. App'x 349 (5th Cir. 2015).

The District of Colorado's decision in *Harris v. Liberty Oilfield Services, LLC* is also directly on point.[125] The plaintiff worked as a field engineer for a fracking company and the plaintiff was the only field engineering on the location, created reports from real-time data that were passed along to the client representative at site, and had a direct impact on the design and implementation of the operation.[126] The court held that the plaintiff was not a "production employee," but rather the plaintiff was akin to an advisor or consultant and thus was exempt from overtime.[127]

Undoubtedly, Plaintiffs will argue that they were merely "production" employees and not an administrative employee and will principally rely on the Fifth Circuit's decision in *Dewan v. M-I, LLC*, in support of this argument.[128] *Dewan*, however, is easily distinguishable and provides no support for Venable's and Kemp's position.

First, *Dewan* was issued before the Supreme Court's decision in *Encino Motorcars*. As the Court is aware, *Encino Motorcars* ushered in a sea change with respect to applying the FLSA's exemptions no longer are court to narrowly construe the exemptions, but, instead, they must be given a fair reading.[129] The Fifth Circuit explicitly noted that it "narrowly construe[d] [the FLSA's] exemptions in favor of the employee."[130]

Second, *Dewan* involved the application of the administrative exemption by itself; it did not address or analyze the HCE.[131] This difference matters—especially in light of the fair reading the Court must give the exemptions--as recently discussed in *Smith v. Ochsner Health Systems*.[132] Under the HCE, "just one of the purportedly exempt employee's 'duties or responsibilities' need be of an administrative

---

[125]    No. 16-cv-01116-CMA-STV, 2018 WL 447355 (D. Colo. Jan. 17, 2018).

[126]    *Id.* at *4.

[127]    *Id.*

[128]    858 F.3d 331 (5th Cir. 2017).

[129]    *Encino Motorcars*, 138 S. Ct. at 1142.

[130]    *Dewan*, 858 F.3d at 334.

[131]    *Id.*

[132]    353 F. Supp. 3d 483 (E.D. La. 2018).

character related to [the employer's] management or general business operations."[133] In other words, it does not matter if an employee who is exempt under the HCE is a production employee; what matters is if the employee perform a single exempt duty or responsibility on a regular and customary basis.

Third, and assuming the Court does give credence to *Dewan* (which it should not), there are substantial differences between the plaintiff's duties in *Dewan* and Plaintiffs' duties that make the *Zannikos* plaintiff the more accurate comparator. The *Smith* court, affirming the district court's decision, made clear that it did not "need to conduct a particularly 'detailed analysis of the employee's job duties [under the HCE]," and that the plaintiff's "level of compensation is the principal consideration."[134] Further, the *Smith* court took care to analyze the difference between the *Dewan* plaintiff's job duties and the *Zannikos* plaintiff's job duties.[135] Part of the *Zannikos* plaintiff's duties was to "overs[ee] oil transfers, 'monitor the loading and unloading of cargo,' and reported on the transfer's compliance with company policies and national safety standards."[136] By contrast, the *Dewan* plaintiff "did not oversee 'work performed by the customers' employees, contractors, and equipment.'"[137] The *Zannikos* plaintiff therefore performed at least one exempt duty "directly related to assisting with the running or servicing of the business."[138]

Finally, the Fifth Circuit's recent decision in *Hobbs v. EVO Inc.*, is of little relavance, but rather gives this Court a roadmap of how it should find Plaintiffs exempt.[139] In *Hobbs*, the district court, after a bench trial, held that the plaintiff was not exempt under the HCE. The plaintiff provided camera services at the employer's client's well sites including advising the client on the quality of pictures he could obtain,

---

[133]   *Id.* at 498.
[134]   *Id.* at 688.
[135]   956 F.3d 681 (5th Cir. 2020).
[136]   *Id.* at 686.
[137]   *Id.* at 687.
[138]   *See id.* at 686-688.
[139]   No. 20-20213, - F.4th -, 2021 WL 3161821 (5th Cir. July 27, 2021).

manually rigging up the camera, directing another contractor on how quickly the camera would be lowered, and operating the camera and tell the Company Man what he saw.[140] The court held that the camera technicians were non-exempt, in part, because the employer did not identify any example of when they "translat[ed] their observations into advice or recommendations regarding what the client could or should do with the well . . . likely because the recommendations, even non-final ones, were beyond the field engineer's limited expertise.[141] Importantly, providing "some sort of recommendation is a prerequisite for [the] caveat" under the regulations that employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level" as part of their involvement with considering alternative courses of conduct and being involved with the decision.[142]

Here, unlike in *EVO*, Plaintiffs were not operating the underreaming tool or the fishing tools but rather were giving advice and recommendations to the client on how to operate the tools.[143] Indeed, it was their duty to translate the data from the well and give advice and instructions to the driller about the customer's operation and use of the underreaming tool, and to ensure it was being operated under the correct parameters.[144]

Additionally, the Fifth Circuit took care to explain why the exempt *Zannikos* plaintiff is different than the *Hobbs* plaintiff. The *Zannikos* plaintiff was exempt because he was "charged with ensuring the quality of the company's product, not with its production."[145] The duties at issue in *Zannikos* "are in many respects distinguishable from those of" the *Hobbs* plaintiffs with the Fifth Circuit specifically noted that the fact that the *Zannikos* plaintiff "supervised the work of" others was an exempt duty.[146]

---

[140]   *Id.* at *1.
[141]   *Id.* at *6.
[142]   *Id.* (quoting 29 C.F.R. § 541.202)
[143]   Ex. A, pp. 92-93, 96, 110, 114-116, 138; Exhibit C, pp. 42-47, 65.
[144]   *Id*.
[145]   2014 WL 12771511 at *9.
[146]   *Id.*

b.      **Plaintiffs Regularly and Customarily Performed Exempt Duties.**

First, the exempt duties that render Plaintiffs exempt under the HCE must be performed "regularly and customarily."[147] Per the regulations:

> The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed "customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks."[148]

Again, while on the rig, Plaintiffs' job as Reamers was to "supervise [Smith's customers'] running of drilling tools,"[149] which included monitoring, analyzing, and recording information.[150] When Smith's clients operated the underreaming tool, Plaintiffs performed such duties. Accordingly, Plaintiffs regularly and customarily performed an exempt duty.

In sum, Plaintiffs admit that they customarily and regularly performed multiple exempt duties as Reamers. The duties they performed are the type that courts have found constitute administrative tasks, and are identified in the FLSA's regulations, and this demonstrates that Plaintiffs customarily and regularly performed at least one administrative duty (numerous duties actually) and therefore, they are exempt under the HCE exemption from the FLSA overtime regulations.

## <u>CONCLUSION</u>

For the foregoing reasons, Smith respectfully submits that it is entitled to judgment as a matter of law because Smith properly classified Venable and Kemp as exempt pursuant to the highly compensated employee and administrative exemptions. Accordingly, the Court should grant Smith's Motion for Summary Judgment and enter an order dismissing Venable's and Kemp's claims, in their entirety, with prejudice.

*/s/ Bryan Edward Bowdler*
Samuel Zurik III (LA Bar #24716

---

[147]     29 C.F.R. § 541.601(a)(1).
[148]     29 C.F.R. § 541.701.
[149]     Exhibit D, ¶ 8.
[150]     Exhibit C, p. 65.

Robert P. Lombardi (LA Bar #26387)
Bryan Edward Bowdler (LA Bar #32097)
**THE KULLMAN FIRM, P.L.C.**
1100 Poydras Street, Suite 1600
New Orleans, LA 70163
Telephone: (504) 524-4162
Facsimile: (504) 596-4189
E-Mail: sz@kullmanlaw.com
E-Mail: rpl@kullmanlaw.com

**ATTORNEYS FOR DEFENDANT, SMITH INTERNATIONAL, INC.**