UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION


JACK VENTON VENABLE, JR.*  CIVIL ACTION NO.
and WILLIAM AGUIRRE,     *  6:19-cv-00241
individually and on      *
behalf of all others     *
similarly situated       *
                         *
        Plaintiffs,      *  JUDGE SUMMERHAYS
                         *
v.                       *
                         *
SCHLUMBERGER LIMITED     *  MAG. JUDGE HANNA
(SCHLUMBERGER N.V.) fka  *
SMITH INTERNATIONAL,     *
INC.            *
                         *
        Defendant.       *


        Deposition via Zoom videoconference of
BRENT K. KEMP, given in the above-entitled cause,
pursuant to the following stipulation on Tuesday,
the 4th day of May, 2021, commencing at 1:08 p.m.
and concluding at 3:45 p.m.


REPORTED BY:

CHERYL L. OHLMEYER
CERTIFIED COURT REPORTER

EXHIBIT C

```
 1    APPEARANCES:

 2

 3    REPRESENTING PLAINTIFF:

 4    KENNETH D. ST. PE'
      Attorney at Law
 5    311 W. University Avenue, Suite A
      Lafayette, Louisiana 70506
 6    Telephone: (337) 534-4043

 7             AND

 8    PARMET PC
      Attorneys at Law
 9    BY:  MATTHEW S. PARMET, ESQ.
      3 Riverway, Suite 1910
10    Houston, Texas 77056
      Telephone:  (713) 999-5228

11

12

13    REPRESENTING DEFENDANT:

14    THE KULLMAN FIRM
      Attorneys at Law
15    BY:  BRYAN EDWARD BOWDLER, ESQ.
      1600 Energy Centre
16    1100 Poydras Street
      New Orleans, Louisiana 70163
17    Telephone: (504) 524-4162

18

19

20

21

22

23

24

25
```

```
 1              I N D E X

 2                  Page

 3   AGREEMENT OF COUNSEL . . . . . . . . . . .    4

 4

 5

 6   EXAMINATION BY

 7        MR. BOWDLER. . . . . . . . . . . . .     5

 8

 9   EXHIBITS

10        #1 - NOTICE OF DEPOSITION . . . . . .   10

11        #2 - CONSENT TO JOIN. . . . . . . . .   13

12        #3 - EMPLOYEE MINI FILE . . . . . . .   29

13        #4 - PAY STATEMENT 12/14/14 - 12/27/14  31

14        #5 - PAY STATEMENT 12/13/15 - 12/26/15  33

15        #6 - PAY STATEMENT 12/11/16 - 12/24/16  34

16        #7 - PAY STATEMENT 11/26/17 - 12/9/17   35

17        #8 - W-2 for 2018 . . . . . . . . . .   35

18        #9 - LOAD CHART SYSTEM . . . . . . .    39

19

20

21   REPORTER'S PAGE . . . . . . . . . . . . .   70

22   REPORTER'S CERTIFICATE . . . . . . . . . . 71

23

24

25
```

```
 1                 S T I P U L A T I O N

 2

 3              It is stipulated and agreed by and

 4      between all parties that the deposition of

 5      BRENT K. KEMP is hereby being taken pursuant to

 6      the Federal Rules of Civil Procedure, in

 7      accordance with law, pursuant to notice;

 8              That formalities, such as sealing,

 9      certification and filing, are waived.  The

10      formalities of reading and signing are not

11      waived.

12              That all objections, save those as to

13      the form of the questions, are hereby reserved

14      until such time as this deposition, or any part

15      thereof, may be used or sought to be used in

16      evidence.

17

18                   *      *      *

19              CHERYL L. OHLMEYER, Certified Court

20      Reporter in and for the State of Louisiana,

21      officiated in administering the oath to the

22      above-named witness.

23                   *      *      *

24

25
```

```
 1              BRENT K. KEMP, 29202 Homer Kemp Road,
 2     Franklinton, Louisiana, 70438, the witness named
 3     in the above stipulation, being first duly sworn
 4     in the cause, testified on his oath as follows:
 5              THE COURT REPORTER:
 6                  Will counsel please identify
 7     themselves and their affiliations and also
 8     stipulate that by agreement of all parties this
 9     deposition is being held via videoconferencing
10     and there is no objection to the witness being
11     sworn in remotely and further stipulate that
12     Southern Court Reporters is in no way responsible
13     for the security of this online proceeding after
14     which I will swear in the witness?
15              MR. ST. PE':
16                  This is Ken St. Pe', counsel for
17     the plaintiff.  I have no objections.
18              MR. PARMET:
19                  This is Matt Parmet, also for the
20     plaintiffs.
21              MR. BOWDLER:
22                  And Bryan Bowdler on behalf of
23     the defendant and no objection as well.
24              - EXAMINATION -
25     BY MR. BOWDLER:
```

1        Q.    Good afternoon, Mr. Kemp.  As you

2   heard, my name is Bryan Bowdler.  I'm one of the

3   attorneys for Smith International in this

4   lawsuit, and we're here for your deposition this

5   afternoon, and just to start with, have you ever

6   given a deposition before today?

7        A.    One time approximately early 80's.

8        Q.    Okay.  So just, you know, sort of

9   before we get started, you know, sort of a couple

10  of things to, you know, to I think just keep in

11  mind as we go forward to try and make things go

12  as smoothly as possible and as easily as possible

13  for our court reporter.

14            So just during the deposition today,

15  I'm going to be asking you a series of questions,

16  and it's just your job to answer my questions to

17  the best of your recollection truthfully, and

18  just, you know, the court reporter just put you

19  under oath, and do you understand this is the

20  same oath you would take as if you were

21  testifying in court?

22        A.    Yes.

23        Q.    Okay.  All right.  And our court

24  reporter is making a transcript of everything

25  that we say today during your deposition.  So

1   when I ask you a question, I'll need you to do

2   your best to remember to respond verbally in

3   response to all my questions.  While it is very

4   natural to respond with like a head shake, you

5   know, a head nod yes or no, just to make sure

6   that our transcript of your deposition is clear,

7   if you do respond that way, understandable, but I

8   just might ask you to clarify and say verbally

9   yes or no just so it's clear on the record.

10  Okay?

11       A.    Yes.

12       Q.    Okay.  And then, likewise, if you'd

13  just do your best to avoid answers such a uh-huh

14  or un-huh, things like that, for the same reason.

15  They just don't come across clearly, and, again,

16  likewise, if you do respond to a question that

17  way, understandable, because it's natural for us

18  all to do that, but, again, I just might ask you

19  to clarify for the transcript.  I'm not trying to

20  pick on you or anything like that.  Okay?

21       A.    I understand.

22       Q.    Okay.  And then just as she is making a

23  transcript of everything we say, if you could,

24  again, do your best to wait till I finish asking

25  my question all the way through before you begin

1   to answer.  Just it's hard for her to take things

2   down if we're both talking at the same time over

3   each other, and then, likewise, I'm going to do

4   my best to let you finish answering all the way

5   before I ask another question, but if for some

6   reason I interrupt you inadvertently and you're

7   not finished, please just let me know and say,

8   oh, you know, I'm not quite done answering yet,

9   and you can go ahead and proceed to finish your

10  answer.  Okay?

11      A.    Yes.

12      Q.    Okay.  And during our deposition if you

13  don't understand any of the questions I ask you

14  here today because I've done a very bad job

15  asking a question and it's not clear or, you

16  know, if the audio cuts out for some reason or I

17  stumble over my words, you know, please let me

18  know so I can ask it again and either clarify and

19  do a better job with making my question clear so

20  that you can hear it.  Okay?

21      A.    Okay.

22      Q.    Okay.  And then, likewise, if I ask you

23  a question today and you proceed to answer it,

24  I'm going to assume that you understood my

25  question fully and that's why you're -- go ahead,

1    and that's why you're answering the question; is

2    that fair?

3        A.    Yes.

4        Q.    Okay.  And then during the course of

5    our deposition, your attorneys may object to some

6    of my questions.  Unless they tell you otherwise

7    after they put their objection on the record, you

8    can go ahead and answer that question or ask me

9    for clarification or whatnot.  Okay?

10       A.    Okay.

11       Q.    Okay.  And then just lastly, if at any

12   point today you need or want to take a break,

13   just let me know, and we'll do so.  We're not

14   here for an endurance competition or anything

15   like that.  So the only thing I would ask is that

16   if I've asked you a question, I will need you to

17   go ahead and answer that question, and then we

18   will go ahead and take a break.  Okay?

19       A.    Okay.

20       Q.    Okay.  And then during your deposition

21   today I will be pulling up and showing you some

22   documents that we're going to attach as exhibits.

23   What I'll do is I'll share my screen so you'll be

24   able to see it there in front of you.  So when I

25   do that, if you need me to scroll up or down,

```
 1    left or right, zoom in, zoom out, you know,

 2    please just let me know what you need so I can,

 3    you know, adjust the image accordingly so you can

 4    read it.  Okay?

 5         A.    Okay.

 6         Q.    All right.  I'm going to go ahead and

 7    pull up and we're going to share.  This is a

 8    document we're going to mark as Exhibit 1 and

 9    just attach to your deposition for the record.

10    This is just -- this is a copy of a Notice of

11    Deposition that scheduled your deposition for

12    today at one p.m.

13               All right, and, Mr. Kemp, what, if

14    anything, did you do in order to prepare for

15    today's deposition?

16         A.    Nothing.

17         Q.    Okay.

18         A.    I didn't know what you was going to

19    ask.

20         Q.    Sure.  Okay.  And in a broader than

21    just preparing for today's deposition, have you

22    spoken with anyone else other than your attorneys

23    about this lawsuit?

24         A.    No.

25         Q.    Okay.  And if you would, just if you
```

```
 1   would state your full name for the record,

 2   please?

 3        A.    Brent Kerwin Kemp.

 4        Q.    And, Mr. Kemp, what is your current

 5   home address?

 6        A.    29202 Homer Kemp Road, Franklinton,

 7   Louisiana, 70438.

 8        Q.    Okay.  And how long have you lived at

 9   that address?

10        A.    Since 1984.

11        Q.    And --

12        A.    That address a couple of times, but

13   I've lived there at the same spot.

14        Q.    Okay.  And I presume you've owned the

15   property at that location?

16        A.    Yes.

17        Q.    Okay.  And, Mr. Kemp, what is your

18   current telephone number?

19        A.    My home phone is 985-848-2686.

20        Q.    Okay.  And that number, that's a land

21   line for your home?

22        A.    Yes.

23        Q.    Okay.  And do you have a cell phone,

24   Mr. Kemp?

25        A.    Yes.  It's 985-515-0080.
```

1      Q.    Okay.  All right.  And, Mr. Kemp, what

2  is the highest level of degree or diploma that

3  you've earned, either undergraduate degree, high

4  school diploma, that sort of thing?

5      A.    High school diploma.

6      Q.    Okay.

7      A.    I have some college, but I didn't

8  finish.

9      Q.    Okay.  And in what year did you

10  graduate from high school?

11      A.    1976.

12      Q.    Okay.  And what high school did you

13  attend?

14      A.    Pine High School.

15      Q.    And where is that located?

16      A.    In Pine, Louisiana.

17      Q.    Okay.  The college courses that you had

18  taken, what was the school at which you took

19  those classes?

20      A.    Southeastern University.

21      Q.    Okay.  And other than this lawsuit that

22  we're here for, have you ever been a party to any

23  other lawsuits?

24      A.    No.

25      Q.    And I'm sorry.  You broke up a little

1    bit.  I didn't quite hear you.

2        A.    No.

3        Q.    No, okay.  Have you ever filed for

4    bankruptcy, Mr. Kemp?

5        A.    No.

6        Q.    Okay.  And this, for our lawsuit today,

7    how did you come to learn about this lawsuit?

8        A.    I'm trying to think if it was through

9    word of mouth from somebody in the company that I

10   worked for.  I'm thinking that's what it was.

11       Q.    Okay.  And do you happen to recall for,

12   you know, that sort of word-of-mouth discussion

13   about the lawsuit, do you happen to remember at

14   all who of the other individuals were that you,

15   you know, talked with about this lawsuit?

16       A.    No.

17       Q.    Okay.  And, Mr. Kemp, I'm going to

18   share my screen again, and this is a document

19   that we're going to mark and attach to your

20   deposition as Exhibit 2, and, mainly, let me

21   scroll down here to this third page, and this is

22   a Consent to Join form to join this lawsuit as a

23   plaintiff.  Do you recall signing this form?

24       A.    Yes, sir.

25       Q.    Okay.  And then just to confirm here on

1    the signature block, that's your signature?

2        A.   Yes, sir.

3        Q.   Okay.  And, Mr. Kemp, what's your

4    general understanding about the claims that are

5    being asserted in this lawsuit?

6        A.   Just we're asking for the overtime pay

7    over 40 hours a week that we worked.

8        Q.   Okay.  And do you have an understanding

9    as to the allegations of why you and the other

10   plaintiffs in this case should have received

11   overtime compensation while working with Smith?

12       A.   Just that being more of a laborer, you

13   know, we're -- supposedly under 40 hours, you're

14   supposed to get overtime pay.

15       Q.   Okay.  And just are you aware of any,

16   you know, documentation that would support your

17   understanding of why you and the other plaintiffs

18   should have received overtime while working with

19   Smith?

20       A.   I can't recall the exact document, but

21   I believe it's in the federal law that states

22   that.

23       Q.   Okay.  And then just anything from your

24   time with Smith such as, you know, just, for an

25   example, things like a job description or, you

1    know, something like that that would discuss, you

2    know, sort of what you were doing, your job

3    duties working for Smith, anything like that that

4    would -- that you are aware of that would support

5    your understanding of why you should have been

6    paid overtime?

7        A.   No.  I don't think I've seen anything

8    like that.

9        Q.   Okay.  And then a somewhat similar

10   question, are you aware of any other individuals

11   who might have knowledge about or would support

12   your understanding of why you and the other

13   plaintiffs should have been paid overtime during

14   your time with Smith?

15       A.   Ask me that again.

16       Q.   Sure.  Just anyone that you're aware of

17   that might have information or knowledge that

18   would support your understanding of why, you

19   know, you think the plaintiffs should have

20   received overtime, you know, people with

21   knowledge of your job, what you were doing, your

22   pay, things like that?

23       A.   I'm sure the Department of Labor.

24       Q.   Okay.  And so during your time working

25   with Smith, it's your belief that you should have

16

```
 1    been paid overtime for hours worked over 40 in a
 2    work week; is that correct?
 3         A.    Yes.
 4         Q.    Okay.  And prior to signing the form
 5    that we showed and marked as Exhibit 2, did you
 6    do any kind of independent research into the law
 7    that's at issue in this case prior to deciding to
 8    join the lawsuit?
 9         A.    No.
10         Q.    Okay.  And did you do any kind of
11    looking into or research about any other lawsuits
12    against Smith or Schlumberger seeking unpaid
13    overtime compensation?
14         A.    No.
15         Q.    Okay.  And prior to deciding to join,
16    did you read the complaint that was filed with
17    the court that initiated this lawsuit?
18         A.    Yes.
19         Q.    You did, okay.  And then why did you
20    decide to join this lawsuit when given the
21    opportunity?
22         A.    Well, I had, from word of mouth in the
23    oil industry, I had talked with several people
24    that other companies for the exact same thing had
25    to start paying, you know, the overtime that
```

1    their workers were working.

2        Q.    Okay.  And when you mentioned the exact

3    same thing, those were other individuals who were

4    working and doing essentially the same type of

5    job that you were doing?

6        A.    Yes.

7        Q.    Okay.  And from those conversations, do

8    you happen to recall the names of any of the

9    other companies that you had heard were required

10   to pay out unpaid overtime?

11       A.    I believe it was Halliburton and Baker.

12       Q.    Okay.  And these were discussions you

13   were having in the -- were they taking place in

14   the mid to late 2017 time period, if you recall?

15       A.    I haven't -- I just remember the

16   conversation.  I don't remember when they was

17   taking place.

18       Q.    Okay.  And when did you first start

19   working in the oilfield services industry?

20       A.    Service industry in 2015, February 28.

21       Q.    Okay.  And you said just February 2015?

22       A.    Yes, February 28, 2015.

23       Q.    Okay.

24       A.    Oh, excuse me.  2005.

25       Q.    2005, okay.  And is that when you

1    started working with Smith in the -- I guess I

2    know the title has changed over time, but I think

3    that we know it as a DTR field specialist

4    position?

5         A.    Reamer hand.

6         Q.    Okay.  And prior to working, going to

7    work for Smith in 2005, who did you work for

8    prior to that?

9         A.    It was Pride International.

10        Q.    Okay.  And realizing it's been some

11   time, just a rough approximate time period of

12   when you worked with Pride International?

13        A.    Yes.  Well, it was the same company I

14   worked for that went through like four buy-outs.

15   It started in 1980, and then I worked all the way

16   to 2005.  I did take off five years in between

17   there and did something else, but it was always

18   the same company.

19        Q.    Okay.  The same company, they just went

20   through some different name changes, things like

21   that?

22        A.    Right.

23        Q.    Okay.  And then looking at I think --

24   let's just limit to the like 2000-2005 time

25   period when you were working with Pride

1   International, what was your position and, you

2   know, what were your job duties?  What things

3   were you doing for them?

4        A.   I was a driller.

5        Q.   Okay.  And then, again, just very

6   generally kind of a five-thousand-foot view, what

7   is it that a driller does and what you did sort

8   of on a day-to-day basis?

9        A.   We were doing workovers on wells and

10  also drilling, just run the rig.

11       Q.   Okay.  And when you started with Smith

12  in 2005, were you hired on and started as a

13  reamer hand, or did you start in a different type

14  of position?

15       A.   No.  I was a reamer hand.

16       Q.   Okay.  And as I understand it, your

17  employment with Smith ended in the May 2019 time

18  period; is that correct?

19       A.   Yes, May the 4th.

20       Q.   Okay.  And did you retire or just

21  voluntarily resign or was it --

22       A.   I voluntarily resigned.

23       Q.   Okay.  Okay.  And then just from when

24  you started until May 2019 when you stopped

25  working with Smith, were your job duties

1   essentially the same during that whole period?  I

2   guess did you work as a reamer hand, that sort of

3   thing, the whole time?

4        A.    I was a reamer hand, and then let's

5   see.  Around 2007, 2008, I also started running

6   whipstocks.

7        Q.    Okay.  And so doing those two types of

8   jobs or, you know, what you did through the end

9   of your employment with Smith?

10       A.    Yes.

11       Q.    Okay.  And after May 2019, have you

12  gone to work for anyone else?

13       A.    No.

14       Q.    Okay.  And how did it come about that

15  you ended up starting to work for Smith?  Was it

16  kind of a recommendation from someone?  Did you

17  respond to an ad, that sort of thing?

18       A.    It was a recommendation from someone.

19  They were -- actually, a reamer hand was on the

20  rig running a reamer, and we was out there about

21  two weeks together, and he had mentioned they was

22  fixing to hire somebody.  The guy didn't show up,

23  and if I wanted, I could apply for it.

24       Q.    Okay.  And focusing, if you will, on

25  the 2014 through 2019 time period when you

1    stopped working with Smith, did you ever work

2    outside of the United States in that time period?

3         A.    No.

4         Q.    Okay.  And just, again, starting in the

5    2014 time period, who was your supervisor/manager

6    in that time-frame?

7         A.    I don't even recall.

8         Q.    Okay.

9         A.    They changed frequently it seemed like.

10        Q.    Okay.  And so I guess why don't we

11   maybe -- so in 2019 when your employment ended,

12   who was your supervisor, direct supervisor, at

13   that time?

14        A.    David Voisin or Visin.

15        Q.    Okay.

16        A.    And I believe there's another guy in

17   Houston.  I can't remember his name.

18        Q.    Okay.  And then if you can recall, just

19   roughly, when did Mr. Voisin start as your

20   supervisor, if you can remember, just rough time

21   period?

22        A.    He had been on the job, worked out of

23   Houma, him and another individual, and they were

24   kind of like co-bosses, and so they strictly did

25   the Rhino reamers, and when I started running

1  reamers, I guess the Rhinos probably in 2007,

2  also, maybe late 2006, they supervised those

3  jobs.

4      Q.    Okay.  And, again, focusing on the 2014

5  to 2019, what types of jobs were you primarily

6  doing?  Were you primarily doing reaming jobs,

7  you know, primarily whipstock or a majority of

8  one versus the other?

9      A.    Probably more reaming jobs with a few

10  whipstocks thrown in, you know.

11      Q.    Okay.  And when you were being

12  supervised by Mr. Voisin, did you have any issues

13  with Mr. Voisin as a manager/supervisor?

14      A.    No.  They were helpful.

15      Q.    Okay.  And then just there are a few

16  other plaintiffs involved with this lawsuit and,

17  you know, associated ones, and just if you would,

18  I'll let you know what their names are and let me

19  know if you know them, if you've worked with

20  them, you know, anything like that.  And the

21  first one, it's Jack Venable?

22      A.    I've seen the name.  I don't know him.

23      Q.    Okay.  And next a gentleman named

24  William Aguirre?

25      A.    Same thing.  I just saw the name.  I

1    don't really know the individual.

2         Q.    Okay.  And how about Charles Myers?

3         A.    Yes, sir.  I remember Charles.  I've

4    never personally worked with him, but I remember

5    seeing him in some training that we've done.

6         Q.    Okay.  Okay.  And next is an individual

7    named Karl Drobish?

8         A.    I don't know him.

9         Q.    Okay.  And then the last name is a

10   gentleman named Joel Story, and I believe he goes

11   by Brent, Brent Story?

12        A.    Yeah.  I know him.  I've actually

13   worked with Brent before.

14        Q.    Okay.  And when you say worked with

15   him, you and him worked on a rig together on a

16   project?

17        A.    I believe I relieved him.

18        Q.    Okay.

19        A.    He may have went on vacation.

20        Q.    And when you worked for Smith in this

21   2014 on time period, you were assigned to I

22   believe the Broussard, Louisiana, office; is that

23   correct?

24        A.    Yes.

25        Q.    Okay.  However, you know, when you

1    worked, you would -- typically, you were sent out

2    to an oil rig either offshore or on land to

3    actually do your work as a reamer hand, correct?

4         A.    Yes.

5         Q.    Okay.  And then just generally

6    speaking, where did you work most often in this

7    time period?  Was it offshore in the Gulf, or

8    were you mainly doing land jobs?

9         A.    Probably, I would say offshore in the

10   Gulf.

11        Q.    Okay.  And when you worked with Smith,

12   did you have access to any other employee's

13   personnel files?

14        A.    No.

15        Q.    Did you have any access to any other

16   employee's payroll records?

17        A.    No.

18        Q.    Were you involved with any discussions

19   with management or, you know, human resources

20   about the compensation paid to reamer hands like

21   yourself?

22        A.    No.

23        Q.    Do you have any knowledge about how or

24   what Smith did when it formulated and established

25   its compensation policies with respect to reamer

1    hands?

2         A.    No.

3         Q.    Did you have any responsibilities for

4    ensuring compliance with any wage and hour laws

5    while you worked for Smith?

6         A.    No.

7         Q.    Did you receive any training on wage

8    and hour law compliance when you worked with

9    Smith?

10        A.    No.

11        Q.    Okay.  Do you have any knowledge or

12   know about what steps Smith took regarding

13   complying with wage and hour laws?

14        A.    No.

15        Q.    When working with Smith, did you ever

16   have any discussion with anyone about classifying

17   reamer hands as exempt from overtime

18   compensation?

19        A.    No.

20        Q.    Did you have any involvement with

21   preparing or writing a job description for the

22   job positions you held while you worked with

23   Smith?

24        A.    No.

25        Q.    Are you aware of whether Smith had been

1    -- has been sued in the past with respect to

2    seeking overtime compensation with respect to

3    reamer hands?

4         A.    No.

5         Q.    Are you aware of any lawsuits against

6    Smith seeking overtime compensation, not just by

7    reamer hands?

8         A.    No.

9         Q.    Are you aware of any government

10   investigations, such as by the Department of

11   Labor or a state agency, into Smith's

12   compensation practices?

13        A.    No.

14        Q.    Do you have any knowledge or

15   information that Smith had been informed in the

16   past by a government agency that its compensation

17   practices violated wage and hour laws?

18        A.    No.

19        Q.    Okay.  All right.  And as I understand

20   it, again, we're focused on this 2014 to 2019

21   time period, during that time period, your

22   compensation that you received consisted of two

23   main components, correct?  You received a salary,

24   and then you also received rig pay, job bonus, et

25   cetera, for the days you were out working on a

1  rig; is that correct?

2      A.    Correct.

3      Q.    Okay.  And focusing for a moment on the

4  salary portion of your compensation, other than

5  things like income taxes, Social Security and

6  other benefits, you know, 401k, things like that,

7  were there ever any deductions taken from your

8  salary, such as, you know, you were suspended for

9  two days or, you know, you didn't show up to work

10  for a day or two and your pay was deducted as a

11  result?

12      A.    No.

13      Q.    Okay.  And during this time, you did

14  understand that part of your compensation was

15  made up of a salary, correct?

16      A.    Yes.

17      Q.    Okay.  And your salary, you received

18  the same salary every week regardless of the

19  amount that you worked, whether, you know, you

20  worked at all, worked zero hours, or if you were,

21  you know, out on a rig for seven days of the

22  week?  Your salary remained the same between

23  those two, correct?

24      A.    Yes.  Most of the time we were offshore

25  or somewhere.

1      Q.    Right.  And were there any weeks that

2   you can recall when you did not work and you were

3   not paid your salary?

4      A.    No.

5      Q.    And was it your understanding that your

6   -- the salary portion of your compensation, it

7   was compensation for all the hours that you

8   worked in a week regardless of how many it was?

9           MR. ST. PE':

10                Object to the form.

11          THE WITNESS:

12                The salary was I guess to keep me

13   from going anywhere else.  It really wasn't that

14   high, but if we wasn't on the job, we was

15   expected to do training, whether it be at home or

16   here in the Broussard/Lafayette area, that the

17   oilfield -- the oil companies required.

18   BY MR. BOWDLER:

19      Q.    Okay.  So in those weeks where, you

20   know, you were doing training either at home

21   online or in the office, your salary was paying

22   you for that time that you spent doing that

23   training; is that correct?

24      A.    Yes.  That was our compensation.  We

25   didn't get any extra pay to attend OSHA BOP or

 1   whatever.

 2        Q.    Just if you recall just kind of off the

 3   top of your head, do you remember what the amount

 4   of your salary was while you were with Smith and,

 5   again, just that 2014 to '19 time period?

 6        A.    Probably around 4200 a month maybe.

 7        Q.    Okay.  And then I'm just going to pull

 8   up and share my screen again, and this is a

 9   document we are going to mark as Exhibit 3 for

10   your deposition, and what this is is a document

11   called an Employee Mini File.  It's a document

12   that Smith/Schlumberger maintains for its

13   employees, and then just turning your attention

14   down here, there's a box that reads Career

15   History.  Here, let me zoom in a little closer,

16   and then I'm just going to scroll over a little

17   bit to the right, and here, there's a column

18   where it's headed up at the top Base Salary, and

19   below that it has the amount $54,700, and just to

20   the extent you can remember, is that consistent

21   with what you recall your salary being working

22   with Smith?

23        A.    Actually, I didn't think it was that

24   high, but if that's what the records show, yeah,

25   I guess it is.

1      Q.    Okay.

2  (Off-the-record due to technical difficulties).

3  BY MR. BOWDLER:

4      Q.    And so, Mr. Kemp, in addition to your

5  salary, you also received as part of your

6  compensation a either rig pay or job bonus day

7  rate as well, correct?

8      A.    Yes.

9      Q.    Okay.  And that was a payment you would

10  receive for each day you were assigned to working

11  on a drilling rig, correct?

12      A.    Yes.

13      Q.    Okay.  And it was determined that it

14  was a flat amount for each day, and then you

15  would get that flat amount for the number of days

16  that you were on the rig, correct?

17      A.    Correct.

18      Q.    And other than being assigned to and

19  working on a rig, were there any other

20  requirements or prerequisites you had to meet in

21  order to receive that compensation?

22      A.    As far as training?

23      Q.    More along the lines so you had to be

24  on the rig, but, you know, anything else such as

25  you're on the rig but you had to work at least

1    five hours a day or it had to be billable to the

2    client or couldn't be any MPT, things like that,

3    or was it just you're on the rig, you get it?

4         A.    We was -- once we got to the rig, we

5    was there 24 hours a day, just whenever they

6    needed us whatever for as far as our tools,

7    anything to do with the tools that we had.

8         Q.    Okay.  Did you ever have an occasion

9    where your supervisor or someone above him or her

10   said that you weren't going to get the rig pay

11   for days you were out on the rig for, you know,

12   for some -- whatever reason?

13        A.    No.

14        Q.    Okay.  And other than days being

15   assigned to and working out on a rig, were there

16   any other days or types of work for which you

17   could earn a similar payment?

18        A.    No.

19        Q.    And, Mr. Kemp, I'm going to -- I'm

20   sharing my screen again.  I'm going to pull up a

21   document that we're going to mark as Exhibit #4

22   to your deposition, and this is a pay statement

23   of yours for the pay period of December 14, 2014

24   through December the 27th, 2014, and have you

25   seen this document prior to today, Mr. Kemp?

1      A.    I've probably seen it.  I may or may

2   not have seen it --

3      Q.    Okay.

4      A.    -- to tell the truth, you know.  I did

5   not see all my paystubs, no.

6      Q.    No.  I understand.  And then I'm going

7   to turn your attention to what's essentially in

8   the second row.  Over in the left, it says, you

9   know, Curr and then YTD and then Gross, Taxes.

10  Do you know the reference to YTD, that that's a

11  reference to year to date?

12     A.    Yes.

13     Q.    Okay.  And then next to the year to

14  date and under the gross column where it says

15  Gross, it has the amount of $214,044.61, and

16  then, again, just generally speaking to the

17  extent you can recall, is that approximately what

18  you earned in total compensation in 2014?

19     A.    Yes.

20     Q.    Okay.  And then just here under this

21  part, this section where it says Earnings, just

22  the last line item here, it reads Base Plus

23  Amount, and do you recall, is that the line item

24  for the day rate rig pay that we were discussing

25  a moment ago, if you know?

1      A.    Yes.

2      Q.    And then there's also a line for STD

3   Full, and I believe that stands for short-term

4   disability?

5      A.    Maybe.

6      Q.    Okay.  And so just during your time

7   with Smith, did you ever go out on disability?

8      A.    I'm trying to think.  I think I had

9   carpal tunnel surgery one time.

10      Q.    Okay.

11      A.    And that may be what it's there for.

12      Q.    Okay.  And, again, just I understand if

13   you don't, do you happen to recall the rough time

14   period when that happened?

15      A.    That was prior to this.

16      Q.    Okay.  And, Mr. Kemp, I'm going to just

17   pull up again.  This is a document we're going to

18   mark and attach to your deposition as Exhibit 5,

19   and this is one of your pay statements, and it's

20   for the pay period of December 13, 2015 through

21   December 26, 2015, and, again, turning your

22   attention to the row with YTD and Gross, it lists

23   an amount of $208,050.10, and, again, to the

24   extent you can recall, is that consistent with

25   what you remember earning total compensation in

1   2015?

2        A.    Yes.

3        Q.    Okay.  And then just here again,

4   there's a last line under earnings.  It refers to

5   DTR wellsite op bonus.  Is that similarly

6   reflecting payment for the day rate rig pay

7   aspect of your compensation just kind under a

8   different name, if you recall?

9        A.    I don't recall.

10       Q.    Okay.

11       A.    I don't know.  Like I say, I didn't see

12  all of them so ...

13       Q.    Sure.  And, Mr. Kemp, I'm going to pull

14  up the document we'll mark as Exhibit 6 for your

15  deposition, and, again, this is one of your pay

16  statements.  It's for the pay period of December

17  the 11th, 2016 through December the 24th, 2016,

18  and, again, turning your attention to here with

19  the gross and year to date, it lists the amount

20  of $143,600.10, and to the extent you can

21  remember, is that consistent with what you recall

22  earning in total compensation in 2016?

23       A.    I guess.  I don't recall it but --

24       Q.    Okay.

25       A.    -- the W-2 says it.

1     Q.    Okay.

2     A.    It must have been a bad year.

3     Q.    So and then just one more, and this is

4  a document we'll mark as Exhibit 7 for your

5  deposition, and, again, this is one of your pay

6  statements, and it's for the pay period of

7  November 26, 2017 through December 9th, 2017,

8  and, again, over there under year to date gross

9  amount, it lists $149,196.25, and, again, is that

10  relatively consistent with what you recall

11  earning in total compensation in 2017?

12     A.    Yes.  I don't recall it, but that's

13  what the W-2 says.

14     Q.    Okay.  Lastly, I'm going to pull up

15  this is your W-2 for 2018, and here, let me zoom

16  in for you so it's a little easier to read.

17  Here, and there's a box number, it says Box 5,

18  Medicare Wages and Tips, and it lists the amount

19  of $165,732.12, and, again, is that -- any reason

20  to doubt that was around your total compensation

21  for 2018?

22     A.    No reason to doubt it.

23     Q.    Okay.  And while you were working with

24  Smith as a reamer hand, did you ever complain or

25  raise a concern with any of your managers or

1    supervisors about your compensation?

2         A.    No.

3         Q.    Okay.  Did you ever discuss with any of

4    them your belief that you should have been paid

5    overtime as a reamer hand?

6         A.    No.

7         Q.    And so when was it that you formulated

8    your belief that you should have been paid

9    overtime when you were working as a reamer hand?

10        A.    I don't really recall.

11        Q.    And at the time when you were working

12   with Smith and being paid a salary, plus the day

13   rate rig pay, did you have any problems with the

14   way that you were being compensated at that time?

15        A.    No.  I wasn't in a position I felt like

16   to say anything, you know.

17        Q.    And so did you -- I guess just for me

18   to clarify then, you felt that there were issues

19   with how you were being paid, just that you were

20   not in a position to raise them or --

21        A.    I knew there was a lot of hours I was

22   putting in, but I didn't know what to do to

23   address the issue, you know.

24        Q.    Okay.

25        A.    I needed a job more than I needed to

 1   make waves.

 2        Q.    Okay.  And then just while you yourself

 3   didn't lodge any complaints or concerns, were you

 4   aware of any other reamer hands who raised

 5   concerns about the method by which they were

 6   being compensated?

 7        A.    No.

 8        Q.    Okay.  And, again, just kind of

 9   limiting ourselves to the 2014 to 2019 time

10   period, you were not required to record for Smith

11   the specific number of hours each day that you

12   worked; is that correct?

13        A.    Correct.

14        Q.    But you did, however, keep track of the

15   specific -- the number of days when you worked,

16   correct?

17        A.    Yeah.

18        Q.    Okay.  And so if you recall, what was

19   the method by which that you, you know, kept

20   track of the days that you worked and reported

21   that to Smith?

22        A.    There was a calendar that you could

23   keep track of the days that we worked on my

24   computer, and I had all that information.  Then

25   the computer started messing up.  So I brought it

1     to Smith.  I think it's -- or one of smith's ITs

2     for a new computer.  He transferred everything

3     over, except none of the information.  I lost

4     everything --

5          Q.    Okay.

6          A.    -- from the day one I worked with Smith

7     until then, and that was right before I left

8     Smith.

9          Q.    Okay.  Do you recall in the April/May

10    2015 time period of using what I believe is an

11    online portal for recording your days work with

12    Smith, and I believe it's referred to as load

13    chart?  Do you remember/recall using anything

14    like that?

15         A.    I remember using, yeah, a load chart.

16    I don't remember how long we actually did it or

17    when we started.

18         Q.    Okay.  And if you recall, prior to when

19    y'all started using the load chart program, how

20    did you keep track of and report to Smith the

21    days that you worked?

22         A.    If we were still on the job, we called

23    in and give them the days that we had worked, and

24    at the end, they got it off the job reports that

25    were turned in.  Supervisors, you know, they kept

1    track of who was working and what.

2         Q.    And, perhaps, this is what you had

3    mentioned earlier.  Other than reporting that you

4    -- reporting your days work to Smith, did you

5    keep any kind of personal calendar or journal of

6    the days or hours that you worked?

7         A.    I kept personal -- it's just a thing on

8    my computer that shows what days I was working.

9         Q.    Okay.  And is that -- that's one of the

10   things you mentioned as when the computer got

11   changed over got lost?

12        A.    Yes.

13        Q.    Okay.

14        A.    Fourteen years information.

15        Q.    And so, Mr. Kemp, I'm going to share my

16   screen with you again.  I'm going to pull up a

17   document we'll mark as Exhibit 9 for your

18   deposition, and this is a report that was

19   generated through the load chart system, and I

20   realize it's probably -- it's pretty small and

21   hard to read.  So I'll do my best with, you know,

22   getting it -- putting it in a legible format for

23   you, and so what I would like to do is let me

24   just scroll down a little bit here.

25             All right.  And in particular, I'm

```
 1    going to -- on this page here, it's the one if
 2    you look in the lower right-hand corner, and I'm
 3    zooming in, it has the number D-000625 on it, and
 4    I just want to ask a couple of questions.  Here
 5    in this column where up at the top it lists time
 6    type, at the start of the page there's listings
 7    for wellsite/job/vessel, and then after a number
 8    of those, there's an entry for on office
 9    base-lab, and I was curious, to the extent you
10    can remember, what does the entry of on office
11    base-lab, what does that -- what kind of work did
12    that reflect?  Were you working in the office, or
13    was it a day you were doing training, things like
14    that, if you recall?  And, again, if you need me
15    to zoom in, et cetera, just, you know, please let
16    me know.
17         A.    Technically, I don't know.  I don't
18    think I ever worked in the office that much in 14
19    years.  I know I never did do training more than
20    a day or two at a time.
21         Q.    Okay.  And -- okay.  So you just can't
22    quite remember what those entries were, like if
23    you were working or what kind of work you were
24    doing?
25         A.    I don't know what that was for.
```

1    Q.    Okay.  And on these, on the load chart,
2  do you recall did you ever mark a day or, you
3  know, fill it out and code it as being on call,
4  if you recall?
5    A.    No, I don't -- I don't think so.  I was
6  either working or getting paid, you know, to be
7  working in this time period.
8    Q.    Sure.  Sure.  And then just -- I
9  apologize.  I'm just going to pull this just back
10 up, what we marked as Exhibit 9, and, again,
11 you're looking at this page where it says
12 D-000619.  Again, to the extent you can recall in
13 here under time type where there's a listing for,
14 you know, local day off or vacation, if you
15 recall, were those days on which you were either
16 -- I guess essentially you were not out on a rig
17 working?
18   A.    I guess.  I really don't know.
19   Q.    Okay.  And if you recall when you
20 started using load chart, did you yourself put in
21 your day's worked entries, or did someone do it
22 on your behalf, if you recall?
23   A.    I think somebody did it for us to start
24 with, and then we had to try to learn how to do
25 it ourselves.

 1      Q.   Okay.  When would -- the time you were
 2  working as a reamer hand, you didn't have a set
 3  schedule; is that correct?
 4      A.    Correct.  We were on 24/7.
 5      Q.    Correct.  Yeah.  My understanding is
 6  right when you would get called out for a job,
 7  and you go out and you would be on the job on the
 8  rig until you were either relieved or the
 9  drilling operations were done, and then you would
10  come in and it would be wait until you get a call
11  for another rig to go out to --
12      A.    Correct.
13      Q.    -- is that correct?  Okay.  And the
14  jobs as well, working on the rig, they also were
15  not necessarily of a set duration?  You could be
16  there a week?  You could be there 30 days, just
17  depended; is that correct?
18      A.    Correct.  I could be there -- the
19  longest was 51 days.
20      Q.    That's quite a long time.  And just if
21  you would, just on a kind of general overview
22  sort of big picture view of things, what were
23  your duties, your day-to-day job duties, as a
24  reamer hand?
25      A.    When we got to the job, we went to the

1    company man to discuss the job coming up, went

2    checked out our tools, measured them, strapped

3    them, started the job report, got all the

4    pictures, got with the drill crew, got links of

5    drill pipe, drill collars, whatever, casing data

6    where we would know where the casing points were,

7    the bottom of the casing, and then it depends on

8    what rig it was; we would make up the BHA, which

9    would be the reamer on their drilling assembly.

10   They would either make it up and rack it back to

11   have it ready, or when they got ready, we would

12   pick it up and go in the hole on the deck, you

13   know.  It just depends on if they had the

14   capability to rack the tools back or not.

15          Then once we went in, they drilled out

16   the cement, got the reamer below the casing; we

17   would open it up, and then they would do their

18   test, and we would start drilling ahead.  I would

19   give the driller prior to this his parameters he

20   had to stay in of what the tool was capable of

21   doing, and I was there just observing and writing

22   down data as they were drilling ahead --

23       Q.    Okay.

24       A.    -- trying to make sure they stayed

25   within the parameters and informed -- every day

1    we would have either a call or send reports,

2    something to the office, let them know what was

3    going on, if they wanted something different, or

4    let them know how the tools were reacting.

5        Q.   Okay.  And going back for a moment, you

6    mentioned one of the steps after you arriving on

7    the rig involved making up the BHA of which the

8    reaming tool was a part of.  When -- it was the

9    rig crew, correct, that did the physical assembly

10   of the BHA; is that correct?

11       A.   Well, it just depends on what rig you

12   was on.  If they operated their equipment, we

13   would assist them in making it up, you know, if

14   they needed assistance.  Some rigs just aren't

15   equipped like other rigs.  Some rigs you can't

16   put your hands on anything.  Some rigs if you

17   didn't, it wouldn't get done.

18       Q.   Okay.  And how often would you say that

19   you were working on rigs where you had to perform

20   some of these tasks instead of it being one of

21   the ones where you said you weren't allowed to

22   touch any of the operator's equipment?

23       A.   Between 60 to 70 percent probably.

24   There were only a few companies that classified

25   as hands-off.

1    Q.   Okay.  And for a moment talking about

2 your role while drilling operations would be

3 going on, you mentioned you were there to give

4 the driller the parameters and make sure that the

5 driller operated the reamer within those

6 parameters, correct?

7    A.   Yes.  I tried to make sure he would

8 stay within the parameters.  Whether they did or

9 not was their and the company man's choosing, but

10 if they did -- if they didn't stay within them,

11 then I made a note of it, reported it back to my

12 office.

13    Q.   Okay.  And do you know why you would be

14 sent out to the rig along with the reaming tool

15 in order to do what you just mentioned if your

16 role was during drilling operations to, you know,

17 observe the driller and do your best to have them

18 stay within the parameters?

19    A.   Well, they just needed somebody there,

20 because if something went wrong, they would need

21 somebody to tell them because the oil company

22 would try to charge them back the time.

23    Q.   Okay.  And then for that, could you

24 just, as someone who's never worked in the

25 oilfield, just could you flesh them out for me

1    just a little bit about sort of some additional

2    detail about what you mean with that?

3         A.    Well, in other words, those drilling

4    rigs, it's several million dollars a day.  So

5    every hour is, you know, fifty, hundred thousand

6    dollars an hour.  If you got downtime on your

7    tools, they're going to charge it back to the

8    company and if they don't stay within our

9    parameters and then there's no guarantee their

10   tool's going to make it, you know, and they're

11   sure not going to tell you they went outside the

12   parameters.

13        Q.    Okay.  And so I guess just, and, again,

14   let me know if I'm, you know, on the same page as

15   you, so you were there just in case if something

16   went wrong with the reaming tool, you were there

17   to say, hey, they were operating outside the

18   parameters, it's not Smith's fault, we're not

19   responsible for MPT and/or kind of vice versa; is

20   that fair?

21             MR. ST. PE':

22                  Object to the form.

23             THE WITNESS:

24                  I could, you know, just -- like I

25   said, I'd give them the parameters for them to

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

1    run our tool.  I couldn't -- we couldn't run the

2    equipment, you know, the rig or anything because

3    of liability issues.  It's basically to keep my

4    boss informed of what was going on.

5         Q.   Okay.  And would you agree with me if I

6    said that then part of your job there was to

7    protect Smith's equipment, sort of making sure

8    that the client wasn't operating outside

9    parameters, and if they did, they understood the

10   ramifications of that, that they might be

11   financially responsible, that sort of thing?

12             MR. ST. PE':

13                  I'm going to object to the form.

14   It's a compound question.  It's concluding and

15   misleading.  You do that a lot with these

16   compound questions.  Most of them are not as

17   misleading, but that's terrible, but you can go

18   ahead and answer if you understand the question.

19             THE WITNESS:

20                  I forgot the question.

21   BY MR. BOWDLER:

22        Q.   Sure.  Just would it be fair and would

23   you agree with me if -- with the statement of

24   part of your role on the rig was to make sure

25   that the customer didn't operate Smith's tools in

1    a way that would damage the tools?

2              MR. ST. PE':

3                   Object to the form.  It's

4    misleading, mischaracterizes his earlier

5    testimony.

6              THE WITNESS:

7                   What I done, like I said, I took

8    down the parameters, and in the mornings, I'd

9    send my report in so they would see how much

10   weight, RPMs, and all we were running on the

11   tools, what kind of -- if I knew what kind of

12   formations we were drilling in, I would give that

13   to them.  Most of the time, we didn't know.  It

14   just depends on what rig you was on if you could

15   get that information, you know.

16   BY MR. BOWDLER:

17       Q.    Okay.  So just what I'm trying to get a

18   sense of, Mr. Kemp, is just, you know, why were

19   you there?  You know, why were you there on the

20   rig?  Why was, you know, the customer paying

21   Smith for your services?

22       A.    They were making money off of us.

23   That's why we were there.  They were charging

24   twice what they was paying us.

25       Q.    Okay.  And then I guess just to

1    clarify, when you say making money, that was

2    Smith that was making money?

3         A.    Yes.

4         Q.    Okay.  Do you know that -- do you know

5    whether when a client, one of Smith customer's,

6    apologies, would use a reaming tool, were they --

7    was it required that you go and be on the rig

8    while they use the tool, again, if you know?

9         A.    It was at one time, and then it was

10   wasn't.  It was more or less strictly up to the

11   customer --

12        Q.    Okay.

13        A.    -- in the later part.

14        Q.    And do you happen to recall the time

15   period when it became up to the customer?

16        A.    No, sir.

17        Q.    Okay.  While on a job out on the

18   drilling rig, what were, if any, the manual labor

19   tasks that you were required to perform?

20        A.    As far as the manual labor was the

21   strapping our tools, getting -- it depends on the

22   -- if it was a whipstock job, there was a lot of

23   components to that whipstock job.  A reaming job,

24   you know, you just got one or two components to

25   hit, but strapping them and getting -- when we

1   picked them up, whatever time it was and getting

2   them made up in the correct spot and the correct

3   position and making sure the floats and stuff was

4   in them, and once the tools were picked up,

5   inspected them, make sure nothing happened in

6   transit.

7        Q.   Okay.  Anything else?

8        A.   I can't think of anything.

9        Q.   Okay.  And if you would, just, again,

10  kind of generally with measuring, strapping the

11  tools, rough idea of how much time that took?

12       A.   It depends on the size of the tool and

13  when it was available.  You would go out there

14  with a crane crew, and you could get it done in

15  four or five hours, and then if they were doing

16  other stuff in between, you may be out there for

17  a day or so, you know.

18       Q.   Okay.  When you say you may be out

19  there a day or so, is that -- that day or so, are

20  you waiting for the crane to be available or --

21       A.   Yes.

22       Q.   Okay.  And then if you would, just

23  literally just the measuring of the tools,

24  approximately, and, again, general idea,

25  understanding it's going to vary, about how much

1    time does that take?

2          A.    Two to three hours.

3          Q.    Okay.  And what's -- my question is why

4    are you -- why would you -- were you required to

5    measure the tools when you arrived on the rig?

6          A.    Everything is -- that goes in the hole

7    is measured.  You got to know where you're at.

8    Plus, also, that's when you're performing your

9    inspection; one, make sure you got the right tool

10   to start with and make sure it's not damaged and

11   the tool has the right components on it --

12         Q.    Okay.

13         A.    -- right threads and whatever.

14         Q.    Okay.  And when the part of -- when you

15   mentioned when you're making up and picking up

16   the tool getting, you know, getting the reamer on

17   the correct position, when you were -- you know,

18   the times when you were doing those tasks, the

19   rig crew wasn't doing it, about how much time

20   does that process take?  How much time did you

21   spend on that?

22         A.    Say that again.

23         Q.    Sure.  The part where you were -- you

24   would make up and pick up the tools,

25   approximately, how long did that take when you

1  were -- those rigs where you had to perform -- do

2  those things?

3      A.    It may would take three, four hours,

4  and it could take 12 hours.  It depended on the

5  efficiency of the rig crew and the ability for

6  them to handle the size tools that we had.  If it

7  was a big tool with a small rig, it took a long

8  time, and experience of the drill crew, too.

9      Q.    And when the BHA was being assembled,

10  was it the rig crew who was like literally

11  screwing on stage by stage, or, again, is that,

12  sort of going back to what you said earlier, some

13  rigs you were involved and did those?

14      A.    If the reamer was out there, I was out

15  there with them, and the other components, they

16  made up their-selves.

17      Q.    Okay.

18      A.    The whole time the BHA was made up, we

19  were up there.

20      Q.    Okay.  And I believe you also mentioned

21  a task of making up some floats in this --

22      A.    We call it a float.

23      Q.    Yeah.  Just what was involved with

24  that?  You know, what were you -- I guess what

25  does that mean to be making up one of the floats?

```
 1        A.    All it is is when they come out, the
 2   placement of the float's decided on by the
 3   company man, the drill crew, and we put them in
 4   our tools.  What that does is prevent pressure
 5   from coming past there.  You had to make sure you
 6   had the right float.
 7        Q.    Okay.  And I guess was that part of the
 8   process of when you were making up the BHA, or
 9   was that done after the fact or before?
10        A.    That was the process of making it up.
11        Q.    Okay.
12        A.    Also, if we had other components in the
13   drill string, you know, we had to make them up,
14   too, where it was like a Rhino stabilizer or
15   whatever.
16        Q.    Okay.  And then just lastly, you had
17   mentioned that the last task involved, making
18   sure nothing happened to the reaming tool in
19   transit and a manual labor task and, again, what
20   did that involve?  What were you doing for that
21   task?
22        A.    Physically inspecting it, if it didn't
23   get dropped by a crane or beat up.
24        Q.    Okay.  So I guess were you observing
25   the rig crew I guess picking up the tool, making
```

1    sure they didn't do anything to damage the tool?

2        A.    Yes.   Right.

3        Q.    Okay.   And in your experience with

4    Smith, did you ever have any instances where

5    while observing the rig crew picking up the tool

6    that they were doing something that you thought

7    would potentially damage or harm the underreaming

8    tool?

9        A.    Not my tool.

10       Q.    Okay.

11       A.    I seen them drop another tool.   I

12   reported it, because when they took it apart on

13   the rig floor, it fell in pieces, and they was

14   wondering why.   I didn't make no friends that day

15   because they're sure not going to tell anybody.

16       Q.    And so kind of I guess overall, the

17   manual labor tasks that you were required to

18   perform, were they necessary, a necessary part of

19   you being able to do your job as a reamer hand?

20       A.    Yes.   We had to strap the tools,

21   inspect the tools, and the other components.

22   When we laid them down, we had to inspect them

23   and grade them, prepare them for shipping.   As

24   far as the tools come out the strap most of the

25   time and aren't strapped down, and we had to

1    strap them back down for shipment.

2        Q.    Okay.  And so, roughly speaking, around

3    what percentage of time did your job involve

4    performing manual labor tasks?

5        A.    10 percent, 15.

6        Q.    Okay.  And kind of fast-forwarding a

7    little bit and while the drilling operations are

8    going on and the rig crew's drilling ahead, where

9    are -- I guess just physically on the rig, where

10   are you working from?  Where are you stationed,

11   for lack of a better word?

12       A.    Most of the time, either sitting behind

13   the driller or sitting where I can see a monitor

14   on the rig floor.

15       Q.    Okay.  And during that time when are

16   you -- you're observing I guess the different

17   measurements and parameters that are on the

18   monitors so you can see what the driller is

19   doing?

20       A.    Yes.

21       Q.    Okay.  And you had also mentioned

22   before that you would talk with the driller

23   about, you know, what the parameters were for the

24   tool on that job, and while you were observing,

25   was that -- I'm trying to think.  I apologize.

1    When you were -- when you would tell the driller

2    about the parameters, was that a, for lack -- I'm

3    trying to think, sort of a constant thing that

4    was going on?  You would say, okay, now that

5    you're at this stage of the well, here are your

6    parameters, or did the driller kind of already

7    know for the course of the well what the

8    parameters were and you were just, you know,

9    checking behind him, or was it more of a constant

10   dialogue between the two of you?

11        A.    It was probably more of a -- I would

12   give him the prior parameters, and then if they

13   went through sand or something, I would remind

14   him that, you know, the reamer's going to be

15   entering the sand at such and such depth, what to

16   do before it got there as far as, you know,

17   reducing to the parameters that we had prior

18   agreed to.

19        Q.    And then I believe as you said then,

20   despite those being the parameters, if the

21   company man wanted to, he could say, no, I want

22   to operate outside those parameters for either

23   this one segment or for the entire drilling

24   operations, correct?

25        A.    Yeah.  There was some.  There was ROP;

```
 1    I saw a greater penetration.  That's all they
 2    wanted.
 3              MR. ST. PE':
 4                   Bryan, let me know when you get
 5    to a spot where you can take a break.
 6              MR. BOWDLER:
 7                   Yes.  This is fine.  We can go
 8    ahead and take a break right now.
 9              MR. ST. PE':
10                   Okay.  About ten minutes.
11              MR. BOWDLER:
12                   About ten minutes, okay.
13              MR. ST. PE':
14                   We'll come back about 3:15?
15              MR. BOWDLER:
16                   Sounds good.
17    (Brief recess taken.)
18    BY MR. BOWDLER:
19        Q.    And, Mr. Kemp, for your job duties
20    while drilling operations were ongoing that you
21    had discussed, how often did you perform those
22    duties while on the job?  Was it once or twice a
23    week, or was it most of the time, you know, that
24    sort of thing?
25              MR. ST. PE':
```

1              I'm going to object to the form

2    of the question.  It's unclear about what job

3    duties you're referring to.

4    BY MR. BOWDLER:

5        Q.    While drilling operations were ongoing,

6    as you said, you were observing the driller and

7    informing him of what the parameters were for the

8    underreaming tool.

9        A.    I was writing in my book every 30

10   minutes unless they changed; I'd make a note of

11   that.

12       Q.    You mentioned as well in addition I

13   think, you know, you were writing down the

14   different parameters in your book, and I believe

15   you had stated earlier, you also -- part of the

16   job you had to fill out a report with that

17   information that you were recording; is that

18   correct?

19       A.    Yes.

20       Q.    Okay.  And the report, I believe that

21   typically was referred to in part of a larger

22   document the operator's resumi?

23       A.    I guess morning report, operator's

24   resumi, I guess it's about the same.

25       Q.    Okay.  And for whom was this report

1   prepared?  Was it for -- were you preparing it

2   for your managers, supervisors back in the

3   office?

4        A.    It just depended.  On different jobs,

5   different people was required or wanted to get

6   it.  Most of them were Schlumberger people, but,

7   you know, it would be my immediate supervisor and

8   his boss, drilling engineers.

9        Q.    And if you know, why was it the

10  individuals who received your report, again, if

11  you know, why did they want to get this

12  information that you were recording?

13       A.    That's their job to find out what was

14  going on and what all was taking place.  They're

15  the ones that planned the jobs.

16       Q.    And do you know or do you have any

17  knowledge about how the individuals received your

18  report used the information recorded in it?

19       A.    No.

20       Q.    Okay.  The reports that you kept, if

21  you know, were they also provided to the

22  customer?

23       A.    No.

24       Q.    Okay.

25       A.    Not by me.

1      Q.    Okay.  And I guess and you don't know

2   from there if anyone else provided it to a

3   customer?

4      A.    No.

5      Q.    Okay.  And you had mentioned as well

6   part of your job was when the reaming tool would

7   come out of the hole, that you would then inspect

8   the tool and grade it, correct?

9      A.    Yes.

10      Q.    And if you know, what was the reason

11   why you would perform this inspection and

12   grading?

13      A.    It would show the wear on the tool,

14   whether it was in gauge, out of gauge, whether

15   the customer had a full gauge hole or if the

16   reamer was wore out and it didn't -- it didn't --

17   they didn't have a full gauge, you know, and,

18   like I said, that was part of the -- what I

19   considered the physical part of the job was like

20   picking it up and laying it out and strapping it

21   all out.  That was the 10 to 15 percent.  If you

22   classify what all I done, you know, that would be

23   70 to 80 percent but --

24      Q.    And --

25      A.    And lot of people --

1       Q.     Go ahead.  I'm sorry.

2       A.     A lot of people have a different

3  definition on physical labor, you know.

4       Q.     Sure.  Sure.  And -- sorry.  I'm sorry.

5  Go ahead.  Please finish.

6       A.     And, like I say, whether you're using a

7  wrench or pushing a pencil, you know, that could

8  be classified as the same thing.

9       Q.     Okay.

10      A.     Go ahead.

11      Q.     Sure.  And you said that one of the

12  items when you were inspecting it was looking for

13  -- looking if the tool was in gauge or out of

14  gauge, and if you would, I guess with that, would

15  that be information I guess for the client to

16  know, hey, look, based on what I saw, the reamer

17  should have enlarged the hole what we were

18  thinking or planning as it should have, or, you

19  know, it didn't quite engage all the way so I

20  don't think we accomplished what we were setting

21  out to do?  Was that what that part of the

22  inspection means, or was it something completely

23  different?

24      A.     Yeah.  Besides me, the company man,

25  they were always there, the directional drillers,

1    were all looking at the reamers, the bits, and,

2    you know, the other components, stabilizers to

3    see what wear and whether they actually had a

4    true hole or not, you know, if everything was in

5    gauge.  Everything was inspected when it come out

6    of the hole as far as the BHA.

7        Q.    Okay.  And when you inspected the tool

8    and did the grading, is that something else that

9    you recorded in the reports that you were keeping

10   on the job?

11       A.    Yes.

12       Q.    And if you know, what, if anything, did

13   Smith use that information for I guess other than

14   as you were talking about with looking to see if

15   they had, you know, the true gauge of the well

16   bore?  Do you know if Smith used that information

17   for anything else?

18       A.    I don't know.

19       Q.    Okay.  And you said one of the things

20   that you did when you would show up on the rig

21   was you would inspect the tools making sure that

22   what was sent to you was the correct tool and

23   that you had everything that you needed, correct?

24       A.    Yes.

25       Q.    Okay.  And if you were missing an item

1    or you had the incorrect tool sent to you, would

2    you then coordinate with your supervisor about

3    getting the correct item sent out to the rig?

4        A.    Yes, immediately.

5        Q.    And after that initial inspection and

6    check to make sure that you had what you needed,

7    as the job progressed, did you ever have -- that

8    was confusing.  Going forward, would you then

9    ever have other instances where you had to

10   coordinate with your manager to get additional

11   equipment sent out to the rig, because as just an

12   example, one part you thought was going to get

13   worn out and for the next segment you would need

14   a new one, anything like that?

15       A.    I would inform them like when we were

16   finishing a section, we'd need the tools for the

17   next section --

18       Q.    Okay.

19       A.    -- which would be different sizes.

20       Q.    And the Smith's customers for whom you

21   provided services to and worked on on those rigs,

22   they were oil and gas development companies; is

23   that correct?

24       A.    Most of them, yes.  I did a few storage

25   facilities jobs.

1    Q.   Okay.  And so for those, the storage

2  facility jobs, who were Smith's customers for

3  those jobs?

4    A.   I don't know if I can tell you that.

5    Q.   You're not allowed?  Sorry.  Go ahead.

6    A.   US Government.

7    Q.   Oh, it was the US government, okay.

8    A.   I'd have to kill you.

9    Q.   I get enough of that from my sister

10  so ...

11       Do you happen to recall the approximate

12  time period of the storage facility jobs?

13    A.   No.

14    Q.   Okay. And putting to one side those

15  storage facility jobs, Smith's customers that

16  were using the underreaming tools, their, if you

17  know, business was to drill and hopefully create

18  a well that would produce oil or natural gas,

19  correct?

20    A.   Yes.  Uh -- yes.

21    Q.   And then I believe as you said earlier,

22  and please correct me if I'm wrong, but while the

23  drilling operations were going on, you yourself

24  were not controlling the BHA or the drill string;

25  is that correct?

1      A.    Yes.

2      Q.    I apologize.  I drew a blank there.

3  And your role as part of the client's drilling

4  operation, as you said, you were there in

5  connection with the operation of the reaming tool

6  and among other things making sure that the

7  driller operated the reaming tool within

8  parameters; is that correct?

9      A.    Yeah.  I was there observing to make

10  sure he was staying in there.  If he got out,

11  then I made notes of it.

12     Q.    Okay.  And then what was, if you were

13  to classify, the main reason or, you know, the

14  primary reason that you were there on the rig?

15  What were kind of your most important job duties,

16  if you will?

17     A.    Getting the tools strapped, ready,

18  getting the information, just more or less

19  recording what all took place.

20     Q.    With your belief in the lawsuit that

21  you should have been paid overtime during your

22  time with Smith, do you also believe that you

23  should have been paid on an hourly basis while

24  you were working with Smith?

25     A.    Yes.

```
 1        Q.    Okay.  And is it your understanding
 2   that if you were paid on an hourly basis, that,
 3   for instance, days when you weren't working and
 4   you were in between jobs, that you would have not
 5   been paid for those days, correct?
 6        A.    If I wouldn't have been working for
 7   Smith, I would be working for somebody else.  It
 8   was more a retainer.
 9        Q.    Have you -- do you have a sense of how
10   much unpaid overtime compensation that you think
11   that you're owed?
12        A.    No.  I know how much time I put in when
13   I was on the job.  That's all I know is just
14   time.
15        Q.    Okay.
16        A.    And not -- I mean, I can't spit you a
17   2,000 hours.  No, I can't do that.  Just, you
18   know --
19             MR. BOWDLER:
20                Okay.  And let me see.  If you
21   guys can maybe give me five minutes off the
22   record.  I don't think I'm going to really have
23   much more.  I can just flip through real quickly
24   like five minutes and then see about getting
25   Mr. Kemp on your way and to the rest of your day.
```

```
 1              MR. ST. PE':

 2                   I'm going to have a question just

 3      to clarify something so ...

 4              MR. BOWDLER:

 5                   Okay.

 6              MR. ST. PE':

 7                   So if you want, I can take it now

 8      or however you want to do it.

 9              MR. BOWDLER:

10                   Yeah.  No.  If you could just

11      give me, you know, five minutes, let me flip

12      through my notes to see if I have anything, and

13      then we'll -- if not, you can ask what you need

14      to ask.

15              MR. ST. PE':

16                   Okay.  Thank you.

17              MR. BOWDLER:

18                   Okay.

19      (Brief recess taken.)

20      BY MR. BOWDLER:

21          Q.    And so just to wrap up, Mr. Kemp, have

22      you told me the truth in response to all of my

23      questions here today?

24          A.    To the best of my ability I have.

25          Q.    Okay.  And is there any of your
```

1    testimony or any of your answers to my questions

2    that you feel you need to go back and either

3    clarify or correct at this time?

4        A.    Well, there was one there, and I had

5    addressed it a little bit, and it was on the

6    manual labor I think or physical labor, and I

7    told you 10 to 15 percent.  I considered that was

8    talking about strapping the tools, making the

9    tools up and laying the tools out, but if you

10   classify me being on the floor standing, sitting,

11   walking them drillships, for sure, that was

12   physical, but you figure all that time in, that's

13   about 80 percent of the time I was there.

14           I'm kind of an insomnia type person,

15   and it was 18 to 21 hours a day I was on the

16   floor.  If that tool was in the hole, I was there

17   most of the time, because as I was told when I

18   took the job, the only way you're going to know

19   what happens is if you was there.

20       Q.    Okay.  And then so just for clarifying,

21   when you talk about the 80 percent of the job

22   with being physical, that included your time

23   either standing or sitting, climbing stairs,

24   walking around, that sort of thing?

25       A.    Yes, as far as back and forth on the

1   drill floor or whatever, you know.

2       Q.    Okay.  And the 15 percent that you had

3   mentioned, that was time where, and correct me

4   please if I'm wrong, you were actually like using

5   your hands, you know, putting things together,

6   taking them apart, measuring, using tools, things

7   like that?

8       A.    Yes.  It's, you know, more of a

9   physical type work as far as labor intensified,

10  pipe wrenches, stuff like that.

11          MR. BOWDLER:

12              Okay.  Got it.  Thank you for

13  that, and so, Mr. Kemp, thank you.  I don't have

14  any other questions for you at this time, and I

15  will go ahead and pass the witness to Mr.

16  St. Pe'.

17          MR. ST. PE':

18              We don't have any questions, but

19  we'll reserve reading and signing.

20          MR. BOWDLER:

21              Okay.  All right.  Well, that's

22  it.  Mr. Kemp, thank you very much for your time

23  this afternoon.  Appreciate it.

24  (Whereupon the deposition was completed at

25  3:45 p.m.)    *       *       *

```
 1
 2
 3
 4                    WITNESS' CERTIFICATE
 5
 6         I have read or have had the foregoing
 7   testimony read to me and hereby certify that it
 8   is a true and correct transcription of my
 9   testimony with the exception of any attached
10   corrections or changes.
11
12
13
14
15
16                   _____
                     BRENT K. KEMP
17
18
19   PLEASE INDICATE
20   ( )   NO CORRECTIONS
21   ( )   CORRECTIONS:  ERRATA SHEET (S) ENCLOSED
22
23
24
25
```

```
 1              REPORTER'S PAGE
 2       I, CHERYL L. OHLMEYER, Certified Court
 3  Reporter, in and for the State of Louisiana, the
 4  officer, as defined in Rule 28 of the Federal
 5  Rules of Civil Procedure and/or Article 1434(B)
 6  of the Louisiana Code of Civil Procedure, before
 7  whom this proceeding was taken, do hereby state
 8  on the Record:
 9       That due to the interaction in the
10  spontaneous discourse of this proceeding, dashes
11  (--) have been used to indicate pauses, changes
12  in thought, and/or talkovers; that same is the
13  proper method for a Court Reporter's
14  transcription of proceeding, and that the dashes
15  (--) do not indicate that words or phrases have
16  been left out of this transcript;
17       That any words and/or names which could not
18  be verified through reference material have been
19  denoted with the phrase "(spelled phonetically)."
20
21
22
23
                  CHERYL L. OHLMEYER
24                Certified Court Reporter
25
```

```
 1              REPORTER'S CERTIFICATE
 2        This certification is valid only for a
      transcript accompanied by my original signature
 3    and original required seal on this page.
 4        I, CHERYL L. OHLMEYER, Certified Court
      Reporter in and for the State of Louisiana, as
 5    the officer before whom this testimony was taken,
      do hereby certify that BRENT K. KEMP, after
 6    having been duly sworn by me upon authority of
      R.S. 37:2554, did testify as hereinabove set
 7    forth in the foregoing 69 pages;
 8        That this testimony was reported by me in the
      stenotype reporting method, was prepared and
 9    transcribed by me or under my personal direction
      and supervision, and is a true and correct
10    transcript to the best of my ability and
      understanding;
11
          That the transcript has been prepared in
12    compliance with transcript format guidelines
      required by statute or by rules of the board, and
13    that I am informed about the complete
      arrangement, financial or otherwise, with the
14    person or entity making arrangements for
      deposition services; that I have acted in
15    compliance with the prohibition on contractual
      relationships, as defined by Louisiana Code of
16    Civil Procedure Article 1434 and in rules and
      advisory opinions of the board;
17
          That I have no actual knowledge of any
18    prohibited employment or contractual
      relationship, direct or indirect, between a court
19    reporting firm and any party litigant in this
      matter nor is there any such relationship between
20    myself and a party litigant in this matter;
21        That I am not of counsel, not related to
      counsel or the parties herein, nor am I otherwise
22    interested in the outcome of this matter.
23    _____  _____
24    DATE SIGNED    CHERYL L. OHLMEYER
                     CERTIFIED COURT REPORTER
25
```